DANCIGER OIL AND REFINERIES, INCORPORATED, V. HAMILL DRILLING COMPANY ET AL.

No. 8033. Decided May 5, 1943.
Rehearing overruled June 2, 1943.
(171 S. W., 2d Series, 321.)

*W. C. Hock,* of Fort Worth, *A. R. Rucks,* of Angelton, *Wm. G. Boatright,* of Kansas City, Mo., *Morgan, Coulton, Morgan & Britain,* of Amarillo, and *Black, Graves & Stayton,* of Austin, for petitioners.

It was error for the Court of Civil Appeals to fail to hold that, under the assignments in question, Hamill was entitled by virtue of the contract, to be paid only on the basis of the value of the mineral in their crude state as produced from the well and not on the basis of the value of the products manufactured therefrom. Anderson v. Bruhlmeyer, 134 Texas 574, 136 S. W. (2d) 800; Remington Rand v. Sugar Land Industries, 137 Texas 409, 153 S. W. (2d) 477; Reynolds v. McMan Oil & Gas Co., 11 S. W. (2d) 778.

*E. H. Suhr, Bryan, Suhr & Bering,* of Houston, *Will E. Orgain.* and *Orgain, Carroll & Bell,* of Beaumont, for respondents.

In the light of the knowledge of both parties that the unpaid purchase money, secured by an express lien on the interest in the leases conveyed, could not be paid out of the crude or raw gas at the prevailing market price, free of operating expenses, which necessarily included making it marketable, and the further fact that the gas, oil, kerosene, butane and gasoline constitute a certain per cent of the raw or crude gas, it is clear that the parties intended that the 1/24 was to be paid out of the gas separated into its components and thus made marketable. Ryan v. Kent, 26 S. W. (2d) 1007; Hoffer Oil Corp. v. Hughes, 16 S. W. (2d) 901; Upham v. Ladd, 128 Texas 14, 95 S. W. (2d) 365.

MR. CHIEF JUSTICE ALEXANDER delivered the opinion of the Court.

This suit involves the construction of an oil and gas mining contract. The material question to be determined is whether or not certain royalty or mineral payments provided for therein were to be based on the value of the crude gas mined from the premises, or its value after the gas had been processed and manufactured into other products.

Danciger Oil and Relneries, Inc., will be referred to as Danciger, and Hamill Drilling Company et al will be referred to as Hamill. The material facts are these. Danciger owned oil and gas mining leases on about 5,000 acres of land in Brazoria County, in the area known as "Pledger." Danciger assigned to Hamill 1/4th interest in the leases, and as part consideration Hamill agreed to drill a well thereon. The well proved to be a gas well. Later, Danciger drilled two additional wells, and they produced gas in abundance. On December 2, 1933, Hamill sold its 1/4th working interest in the leases to Danciger. This sale was accomplished by two instruments—a contract of sale and a formal assignment—both contemporaneously executed. In consideration of the interest so acquired Danciger agreed to pay Hamill $75,000.00 in money, of which $25,000.00 was payable on execution of the contract of sale, and the remaining $50,000.00 in monthly installments of $2,500.00; and $25,000.00 in monthly installments of $2,500.00 each, in the event any well or wells on the leased premises should be capable of producing oil at the rate of 1,000 barrels per day for thirty consecutive days. A further provision was made for an overriding royalty or mineral payment to Hamill of 1/24th of all the oil, gas, casinghead gas, and other minerals produced from the leased premises until the sum of $1,000,000.00 had been paid. Only the provision for the payment of the $1,000,000.00 is here involved. The reservation clause in the assignment covering this item was as follows:

"Said Assignor hereby retains as a part of the consideration for this assignment and shall be entitled to receive one twenty fourth (1/24th) of all the oil, gas, casinghead gas, and other minerals produced, saved and marketed at the prevailing market price paid by major companies in the Gulf Coastal area from the properties above described free and clear of operating expenses if, as and when produced, saved and marketed, until it shall have received the sum of One Million ($1,000.000) Dollars, it being understood, however, that said payment does not constitute a personal obligation of the Assignee and does not increase the drilling obligation upon said leasehold property, but shall constitute a lien thereon."

A similar reservation clause contained in the contract read as follows:

"One Million ($1,000,000) Dollars payable out of one twenty-fourth (1/24th) of all the oil, gas, casinghead gas, and other minerals, if, as and when produced, saved and marketed at prevailing market prices paid by major companies in Gulf Coast area, from said properties. It is understood and agreed that this

payment of One Million ($1,000,000) Dollars is a contingent payment only, and payable out of the products named, and does not constitute a personal obligation of Party of the Second Part and does not increase the drilling operations upon said leasehold estates."

At the time the assignment was made and the contract entered into, it was then known that the wells that had been drilled produced only "sweet gas," but Hamill was of the opinion that they could be converted into oil wells. There was no market in the vicinity at that time for "sweet gas." The parties knew this. Danciger, through one of its subsidaries, was then engaged in the erection of a very expensive absorption or distillation plant on the leased premises for the purpose of separating the gas produced from the premises into its component parts. Hamill was unaware that the plant was being erected by a subsidiary corporation, but thought it was being built by Danciger. The raw or crude gas produced from the premises is now being run through the absorption or distillation plant, where it is separated, at considerable expense, into the following components: Gasoline, gas-oil, distillate, kerosene, butane, propane, and residue gas.

Hamill sued Danciger for an accounting. It is Hamill's contention that it is entitled to be paid one-twenty-fourth of the gross receipts of all products manufactured from the gas produced on the premises, without any deduction for the cost of processing the gas into gasoline and other products. It is Danciger's contention that it is liable only for one-twenty-fourth of the value of the crude gas as produced. The judgment of the trial court was in favor of Hamill, and that judgment was affirmed by the Court of Civil Appeals.

██ After a most careful consideration, we have concluded that the trial court and the Court of Civil Appeals were in error. Since the formal assignment and the contract were executed simultaneously, they must be construed as a single instrument. The assignment provides that the payments shall be made out of "one twenty fourth (1/24th) of all the oil, gas, casinghead gas, and other minerals produced, saved and marketed at the prevailing market price paid by major companies in the Gulf Coastal area from the properties." The contract provides that such payments shall be made "out of one twenty-fourth (1/24th) of all oil, gas, casinghead gas and other minerals, if, as and when produced, saved and marketed at the prevailing market prices paid by major companies in the Gulf Coast area, from

*said properties."* It further provides that the payment shall be *"payable out of the products named,* and does not constitute a personal obligation." No provision was made for the processing of the products, nor for the payments to be made out of the processed products. On the contrary, the payments were to be made out of the products named. Among the products named is "gas." The parties knew what kind of gas was being produced from the properties when the contract was entered into. Consequently payments out of gas as was then being produced, and as was clearly understood by the parties, constitute full compliance with the contract. The payments were to be made out of "gas \* \* \* if, *as* and *when* produced," and not out of its value after it had been processed into a product of a higher value. It is true the contract provided that the payments were to be made out of "gas \* \* \* as \* \* \* produced, saved, and *marketed,"* and the evidence shows that there is not now, and was not at the time the contract was entered into, any market in that vicinity for gas of the kind being produced from the properties; but this does not imply an obligation to convert this named product into other products in the event there should prove to be no market for it as produced. This clause, "payable out of one twenty-fourth (1/24) of all oil gas \* \* \*, if, as and when produced, saved and marketed," limited Danciger's obligation to pay only for such of the products as were so produced, saved and marketed. It did not obligate Danciger to provide a market for all the products produced. So far as processing is concerned, this provision, at most, would only require the producer to put the gas in condition for marketing as "gas" of the kind contemplated by the parties. It is not contended, however, that the lack of a market is due to the fact that the gas as produced and saved is so mixed with other products as not to be "gas" of the kind contemplated by them. The gas is being produced and saved in the very form contemplated by the parties, and the lack of a market is due to the absence of buyers and consumers of such a product in that particular field. The payments were to be made to Hamill out of the oil, gas, and other minerals "produced, saved and marketed \* \* \* *free and clear of operating expenses."* Operating expenses, as here used, refers to the expenses necessary in producing for the market the products as named—that is, as oil, gas, etc., and not to the expenses of processing the named product into some other product after it has been produced. In our opinion, Hamill, having stipulated for payment out of "gas," with full knowledge of the kind of gas that was being produced from the premises, is bound to accept payments out of gas as it was then being produced from the wells, and is not entitled to have the gas refined into some other commodity.

Armstrong v. Skelly Oil Co., 55 F. (2d) 1066; Magnolia Pet. Co. v. Connellee (Com. App.), 11 S. W. (2d) 158.

Our holding on this question is strengthened by the fact that the contract provides that the payments shall be made out of "oil, gas," etc., yet it is conceded by Hamill that it would not be necessary for Danciger to refine the oil into other products as its expense in order to comply with the contract. But the same language is used with reference to gas as is used with reference to oil and other products. Which of the products must be refined, and which need not be refined? If Danciger was not required by the contract to refine the oil so produced, by that provision thereof is it required to refine any of the other products named therein? Moreover, if some of the products are to be refined, to what fineness are they to be refined? See Lone Star Gas Co. v. Stine (Com. App.), 41 S. W. (2d) 48, 49.

■ Hamill contends that since it was provided in the contract that the gas was to be paid for at the "prevailing market prices paid by major companies in the Gulf Coast area," and since the parties knew at the time the contract was made that there was no market in that vicinity for gas such as was being produced from the lease, we should hold, in the light of these "surrounding circumstances," that the parties contemplated that Danciger should, at its own expense, manufacture the gas into some product that would be marketable in that vicinity. We are not in accord with this view. It is not infrequent that contracts of this kind are entered into in new fields before a market has been established for the products named. They are entered into in contemplation that a market will be created when the supply of goods justifies it. The mere fact that there was then no market in that vicinity for the product then being produced from the lease, is not alone sufficient to justify us in overturning the plain, certain, and unambiguous terms of the contract. In order for us to sustain Hamill's contention it would be necessary for us to write into the contract terms that are not only not embodied therein, but that would be contrary to and in conflict with the terms used herein. Hamill's contention in this respect is overruled.

This requires a reversal of the judgments of the Court of Civil Appeals and the trial court. If there is no market in the stipulated area for the crude gas as produced, Danciger is liable for the fair and reasonable value thereof. It does not appear that the case has been fully developed as to the reasonable value of

such gas. For this reason the cause must be remanded to the trial court for a new trial.

The judgments of the trial court and the Court of Civil Appeals are reversed, and the cause is remanded for a new trial.

Opinion delivered May 5, 1943.

Rehearing overruled June 2, 1943.