**Dorothea C. WEST, Roger West, Jason West, and Stephanie West, Plaintiffs and Appellants,**

v.

**ALPAR RESOURCES, INC., Defendants and Appellees.**

Civ. No. 9794.

Supreme Court of North Dakota.

Oct. 27, 1980.

 

Wegner, Fraase & Nordeng, Fargo, for plaintiffs and appellants; argued by Mervin Nordeng, Fargo.

Fleck, Mather, Strutz & Mayer, Bismarck, for defendants and appellees; appearance by Jane Fleck Romanov, Bismarck; argued by Russell R. Mather, Bismarck.

Bickle, Coles & Snyder, Bismarck, and Michael C. Smith, Tulsa, Okl., for Gulf Oil Corp., amicus curiae.

Owen L. Anderson, Asst. Atty. Gen., UND School of Law, Grand Forks, and John W. Morrison, Jr., Bismarck, Counsel, State Land Dept. for State of North Dakota, by and through the Board of University and School Lands, amicus curiae.

ERICKSTAD, Chief Justice.

This is an appeal by the plaintiffs, Dorothea C. West, Roger West, Jason West, and Stephanie West (hereinafter the Wests) from the partial summary judgment of the McKenzie County District Court entered April 15, 1980, dismissing, with prejudice, counts I and II of the Wests' action against the defendant, Alpar Resources, Inc. (hereinafter Alpar). Pursuant to Rule 54(b) of the North Dakota Rules of Civil Procedure, the district court made an express determination that there was no just reason for delay of decision on counts I and II and ordered that judgment be entered dismissing those counts with prejudice. In view of such determination by the court under Rule 54(b), N.D.R.Civ.P., the partial summary judgment is appealable to this Court at this time prior to a final adjudication of the remaining issues raised in the complaint.

On September 30, 1969, an oil and gas lease was executed between the Wests' predecessors in interest, as lessor, and Alpar's predecessor in interest, as lessee. The lease involved property within a 320–acre pooling unit upon which is located Alpar's Peterson No. 1 gas well. Gas production from that well has entitled the Wests to receive royalties pursuant to the following clause in the lease:

"The lessee shall pay lessor, as royalty, one–eighth of the proceeds from the sale of the gas, as such, for gas from wells where gas only is found and where not sold shall pay Fifty ($50.00) Dollars per annum as royalty from each such well, and while such royalty is so paid, such well shall be held to be a producing well."

Prior to making royalty payments, Alpar requested the Wests to sign a division order which provided in pertinent part:

"Settlements for all Gas sold from the Lease . . . will be based on the net proceeds received by Alpar from each sale thereof. . . . As used herein, net proceeds means the actual proceeds received by Alpar from each sale of gas, less dehydration, gathering, compressing, treating and any other actual costs and expenses required to make the gas marketable and transport same to the point or points of delivery to the purchaser."

The Wests refused to sign Alpar's division order because in their view the lease required Alpar to make royalty payments to them based upon one–eighth of the gross proceeds without deduction of expenses. However, the Wests did sign a division order prepared by their counsel which provided for royalty payments on the basis of gross proceeds received by Alpar from the sale of the gas. Such division order was unacceptable to Alpar, and royalty payments were not made to the Wests.

On October 30, 1979, the Wests filed an action against Alpar in the McKenzie County District Court. In count I of the complaint, the Wests requested the court to award them royalty payments under the lease based upon one–eighth of the gross proceeds received by Alpar from the sale of the gas. In count II of the complaint, the Wests requested the court to declare the lease terminated by its own terms, or in the alternative, to declare the lease cancelled under Section 47–16–39.1, N.D.C.C., based upon Alpar's failure to make royalty payments to the Wests. In count III of the complaint, the Wests requested exemplary damages for Alpar's refusal to make any royalty payments to them unless they

would sign Alpar's proposed division order. Subsequent to the filing of the complaint, Alpar tendered, and the Wests accepted, royalty payments based upon one–eighth of the "net proceeds" from the sale of the gas derived by deducting certain expenses according to Alpar's interpretation of the lease. Both parties understood that such payments were received by the Wests subject to their claim for additional royalty payments based upon gross proceeds, and, thus, it is undisputed that acceptance of such royalty payments did not constitute a waiver of the Wests' claim.

The Wests and Alpar filed a written stipulation before the district court stating that counts I and II of the complaint involved issues of law appropriate for disposition by summary judgment. Subsequent to the filing of the stipulation, Alpar filed a motion for partial summary judgment requesting that counts I and II be dismissed. A hearing on the motion was held on April 7, 1980, at which neither party attempted to introduce testimony of the intent of the original parties upon executing the oil and gas lease or of custom or usage relating to the interpretation of such lease. Based upon the trial briefs and the affidavits and oral argument of counsel, the district court determined that the costs Alpar deducted from the royalty payments were properly deductible under the lease as processing costs to be shared by both parties. The district court further determined that the lease had not terminated upon its own terms and that equity would not permit the court to cancel the lease under Section 47–16–39.1, N.D. C.C., for Alpar's failure to make royalty payments, because the amount of such payments were genuinely disputed between the parties. Accordingly, the district court dismissed counts I and II of the complaint with prejudice and ordered partial summary judgment thereupon.

On appeal, the Wests assert that the district court erroneously interpreted the oil and gas lease and ask this Court to interpret the lease with respect to the following three issues:

(1) Whether or not Alpar is entitled to deduct from the royalty payments a proportionate share of expenses incurred by Alpar;

(2) Whether or not the oil and gas lease terminated by its own terms upon Alpar's failure to make royalty payments to the Wests prior to the commencement of their lawsuit; and

(3) Whether or not the district court erred in refusing to cancel the lease pursuant to Section 47–16–39.1, N.D. C.C.

### Deduction of Expenses From Royalty Payments

A brief iteration of additional facts is necessary for a clear understanding of the first issue. The gas obtained from the well on the lease premises contains hydrogen sulfide which is known in the oil and gas industry as "dirty" or "sour" gas. In order to obtain "clean" or "sweet" gas which is a usable and marketable product it is necessary to extract the hydrogen sulfide from the sour gas. That process requires an amine plant facility, and Alpar decided to construct such a facility on the lease premises. The sweet gas was then sold by Alpar to Montana–Dakota Utilities Company. The construction of the amine plant and the removal of the hyrdrogen sulfide was a relatively expensive undertaking, and Alpar asserts that, under the lease, it is entitled to deduct a proportionate share of such costs from the royalty payments owed to the Wests. The Wests assert that the lease entitles them to royalty based upon one-eighth of the gross proceeds received from the sale of the gas without deduction for the costs of extracting hydrogen sulfide or for other costs incurred by Alpar prior to the sale of the gas.

The royalty clause provides that the lessor is to receive "one–eighth of the proceeds from the sale of the gas." There is no additional language in the lease to describe the amount of royalty to be paid or the manner in which the royalty is to be computed. The district court construed the royalty clause as allowing a deduction from the royalty payments of a proportionate share of the processing costs necessary to make the gas saleable.

This Court is requested to construe the written lease by the language used therein without the benefit of extrinsic evidence of the parties' intentions or of evidence showing custom and usage in the oil and gas industry relating to the interpretation of such leases. However, both parties have cited a number of case decisions in other jurisdictions which they assert support their interpretation of the royalty clause in the instant case.

In its appellate brief, Alpar cites a number of cases allegedly supporting its position that, under the lease, it is entitled to deduct a proportionate share of the costs of extracting hydrogen sulfide as well as a proportionate share of other "processing costs" from the royalty payments made to the Wests. *Freeland v. Sun Oil Company*, 277 F.2d 154 (5th Cir. 1960); *Matzen v. Hugoton Production Company*, 182 Kan. 456, 321 P.2d 576 (1958); *State v. Cities Service Oil Company*, 317 P.2d 722 (Okl. 1957); *Le Cuno Oil Company v. Smith*, 306 S.W.2d 190 (Tex.Civ.App. 1957); *Phillips Petroleum Co. v. Record*, 146 F.2d 485 (5th Cir. 1944); and *Danciger Oil & Refineries v. Hamill Drilling Co.*, 141 Tex. 153, 171 S.W.2d 321 (1943). Our examination of these cases reveals that each is distinguishable from the instant case either in that it involved a royalty clause different from the one in the instant case or that it involved different factual circumstances or legal issues than are involved in the instant case.

Of those cases cited by Alpar, *Matzen* is perhaps the most applicable because the lease therein contained a royalty clause identical to the one in the instant case providing that the lessor was to receive "one–eighth of the proceeds from the sale of the gas." In *Matzen*, the Kansas Supreme Court did state that the lessee was entitled to deduct from the royalty payments reasonable expenses relating to the costs and charges of gathering, processing, and marketing the gas. However, there are significant distinguishing facts between *Matzen* and the instant case.

The lessor in *Matzen* agreed that the royalty payments were subject to a deduction for the reasonable costs of gathering, processing and marketing the gas. Also, the lessor and lessee agreed that the royalty obligation was to be determined at the "wellhead" rather than at the point of sale. The primary issue in *Matzen* focused upon whether or not the lessee's federal and state income tax expenses should have been included as part of the expenses deductible from gross proceeds in computing the royalty obligation. In the instant case, the Wests assert that the lease does not allow a deduction of expenses from the royalty payments; nor do they agree that the royalty obligation is to be determined at the wellhead rather than at the point of sale.

*Le Cuno* involved the interpretation of a division order which provided that royalty was to be paid to the lessors on the basis of "the price received at the wells." The parties agreed that their respective rights rested upon an interpretation of the division order and also agreed that the royalty payments were subject to a deduction for costs of transportation, processing, dehydrating, and delivering the gas. The objection raised by the lessors in *Le Cuno* was that the jury should have been required to find the actual cost of the expenses to the lessee rather than to have been allowed to determine the reasonable cost for such expenses upon which the deduction from the royalty payments was based. Thus, *Le Cuno* is distinguishable from the instant case in that it involved the interpretation of a different royalty clause and that the lessors agreed that a deduction of expenses was permitted under the particular royalty clause involved therein.

The other cases cited by Alpar in support of its interpretation of the royalty clause contain similar distinguishing circumstances, and we find that none of the foregoing cases are particularly persuasive authority to guide this Court in its interpretation of the royalty clause involved herein.

The Wests have cited a number of cases in support of their assertion that they are entitled to royalty payments of one–eighth of the "gross" proceeds received from the sale of the gas without allowance for a proportionate deduction of the costs of extracting hydrogen sulfide from the gas or of other costs of producing, processing, or marketing the gas. *Schupbach v. Continental Oil Company*, 193 Kan. 401, 394 P.2d 1 (1964); *Gilmore v. Superior Oil Company*, 192 Kan. 388, 388 P.2d 602 (1964); *Warfield Natural Gas Co. v. Allen*, 261 Ky. 840, 88 S.W.2d 989 (1935); and *Ladd v. Upham*, 58 S.W.2d 1037 (Tex.Civ.App. 1933), aff'd, 128 Tex. 14, 95 S.W.2d 365 (1936).

*Warfield* involved a royalty clause providing that the lessor was entitled to "one–eighth of proceeds received from the sale" of the gas from the lessor's well. In concluding that the lessee was not entitled to deduct a portion of the expenses of producing and marketing the gas from the royalty payments, the Kentucky Court of Appeals stated:

> "Defendant had the exclusive right to produce the gas and to market the gas. It was as much its duty to find the market as to find the gas. Nothing is said about its expenses in doing either. It must be presumed that the payment by the defendant of its expenses in doing both is the consideration it is to pay for its seven–eights of the proceeds, for it pays no other and it certainly gets the lion's share.
>
> "Proceeds of a sale, unless there is something in the context showing to the contrary, means total proceeds." [Citations omitted.] 88 S.W.2d at 991.

However, the court's decision was not entirely in the lessor's favor. Because the lease was silent as to where the market price was to be found, the court concluded that the market price or proceeds would be determined at the place of production. Accordingly, the court determined that even though the lessee may sell the gas at a location distant from the well at a higher price than could be obtained at the well location, the lessor was entitled to only one–eighth of the total proceeds obtainable in the vicinity of the well.

*Gilmore* involved a royalty clause which provided that the lessor was entitled to "one–eighth of the proceeds from the sale of the gas at the mouth of the well." The gas obtained at the mouth of the well was at such a low pressure that it was unmarketable. In order to obtain a saleable product, the lessee constructed a compression station on the lease premises and was thereafter able to sell the compressed gas to a gas company. The Kansas Supreme Court determined that there was an implied duty upon the lessee to render the gas marketable and that the expense of compressing the gas in order to make it marketable was in satisfaction of that duty. Accordingly, the court concluded that no part of such expense was chargeable to the lessor as a deduction from his royalty payments. The court's decision in *Gilmore* was again followed in *Schupbach.*

The major treatises on oil and gas law demonstrate the unsettled nature of the law in this area. *3 Williams, Oil and Gas Law*, pp. 591–603 (1979); *3 Kuntz, Law of Oil and Gas*, pp. 319–327 (1967); *Merrill, Covenants Implied in Oil and Gas Leases*, pp. 212–218 (2nd Ed. 1940). The authors of these treatises are in apparent agreement that there is an implied duty upon the lessee under an oil and gas lease to bear the entire expense of "production." They are also in apparent agreement that, unless there is an express provision in the lease to the contrary, the costs of "processing" are to be shared by the lessor and the lessee. However, these authorities disagree as to which items constitute "production" expenses and which constitute "processing" expenses.

With regard to apportioning expenses of production and processing, Kuntz states in his treatise, *Law of Oil and Gas*, at page 323:

"... it may be concluded that the lessee has a duty to produce a marketable product and to bear all expenses of such production that the lessee has a duty to market the product after it is extracted, but that unless the lease reveals a contrary intention, the expenses incident to marketing the product should be shared by the lessor and lessee. To some extent, such conclusions are supported by cases on the subject."

Under Kuntz's view, the acts which constitute production (*i. e.* those acts the expense of which must be born entirely by the lessee) do not cease until a "marketable product" is obtained. It is arguable that under this view Alpar could not deduct the cost of extracting hydrogen sulfide from the royalty payments if such process was necessary to render the gas marketable.

Williams, in his treatise *Oil and Gas Law*, expresses the view that "expenses of treatment required to make the mineral product saleable" are to be included among the processing or "subsequent to production" costs to be shared by both lessor and lessee. Williams also includes "expenses of compressing gas to make it deliverable into a purchaser's pipeline" as a processing cost to be shared by both lessor and lessee. However, with respect to royalty clauses that provide for a royalty based on a share of the "proceeds" Williams states that it is necessary for such clauses to specify which expenses, if any, are to be shared by the lessor and the lessee:

"A royalty or other nonoperating interest may be described as a share of the 'proceeds' of production without a clear specification as to whether proceeds 'at the well' or proceeds 'at the place of sale' is meant. Under such circumstances there arises a difficult construction question: are net or gross proceeds the basis of settlement? In many jurisdictions there is inadequate case authority on this construction problem to make results predictable. Wherever the term 'proceeds' or its equivalent is used as a basis for calculating royalty or other nonoperating interests the instrument should specify either the place at which proceeds are to be calculated (*viz.*, 'at the well,' or 'at the place of delivery of mineral products to a purchaser') or the expenses to which the nonoperating interest is subject." [Footnotes omitted.] *3 Williams, Oil and Gas Law*, at 601–603.

Merrill, in his treatise *Covenants Implied in Oil and Gas Leases*, asserts as does Kuntz, that a lessee must bear the expense of obtaining a merchantable product. With regard to this issue, Merrill states at pages 214–215:

"If it is the lessee's obligation to market the product, it seems necessarily to follow that his is the task also to prepare it for market, if it is unmerchantable in its natural form. No part of the costs of marketing or of preparation for sale is chargeable to the lessor." [Footnotes omitted.] [1]

Upon examining the decisions of various jurisdictions and the major treatises on this issue, we are in agreement with the conclusion of the author of the annotation entitled "Expenses and Taxes Deductible by Lessee in Computing Lessor's Oil and Gas Royalty or Other Return," 73 A.L.R.2d 1056 (1960) at 1057–1058:

"It is not possible to state in a broad general form what items of expense, if any, a lessee, or lease operator, will be entitled to deduct in computing and paying royalty, or so–called 'bonus,' or other stipulated return to which the lessor or his successor in interest is entitled. The question in any case must be determined with reference to the terms and provisions of the given lease, the nature of the claimed deductible items, and the precise character of the royalty or other return to be paid or rendered."

■ Construction of a written contract to determine its legal effect is a question of law for the court to decide, and, on appeal, this Court will independently examine and construe the contract to determine whether or not the trial judge erred in his interpretation of it. *Metcalf v. Security International Insurance Co.*, 261 N.W.2d 795 (N.D. 1978). Although the foregoing authorities provide background and helpful insight, we must ultimately decide this case upon the express language of the lease using appropriate rules for interpreting contractual agreements.

Pursuant to Section 9–07–19, N.D.C.C., the language of a contract, in cases of uncertainty, should be interpreted most strongly against the party who caused the uncertainty to exist. This Court has stated that the ambiguous terms of a contract will be interpreted most strongly against the party who caused the ambiguity. *Grove v. Charbonneau Buick–Pontiac, Inc.*, 240 N.W.2d 853 (N.D. 1976). An ambiguity exists under a contract when good arguments can be made for either of several contrary positions as to the meaning of a term. *Kruger v. Soreide*, 246 N.W.2d 764 (N.D. 1976).

■ We are of the opinion that the royalty clause involved herein is ambiguous. The royalty clause simply provides that the lessor is entitled to receive "one–eighth of the proceeds from the sale of the gas" without further explanation. Rational arguments can be made in support of the view that the term "proceeds" means gross proceeds without deduction for expenses as well as in support of the view that the term "proceeds" means net proceeds derived by deducting production and processing expenses from the price received for the gas. Rational arguments can also be made to support the view that the royalty obligation is to be determined at the wellhead as well as to support the view that the royalty obligation is to be determined at the location of the sale of the gas. We agree with the following language of the Kansas Supreme Court in *Gilmore v. Superior Oil Company*, 192 Kan. 388, 388 P.2d 602 (1964), with regard to construction of oil and gas leases:

"Construction of oil and gas leases containing ambiguities is in favor of the lessor and against the lessee for the reason that the lessee usually provides the lease form or dictates the terms thereof and if such lessee is desirous of more complete coverage, the lessee has the opportunity to protect itself by the manner

---

1. But *see*, 25 Oklahoma Law Review Oil and Gas: Non–operating Oil and Gas Interests Liability for Post–production Costs and Expenses, pp. 353–380 (1972), wherein the authors question the authorities cited by Merrill in reaching his conclusion.

in which its draws the lease." 388 P.2d at 603.

In determining that an oil and gas lease should be construed most strongly against the lessee, the Texas Court of Civil Appeals in the case of *Ladd v. Upham*, 58 S.W.2d 1037 (Tex.Civ.App. 1933), *aff'd*, 128 Tex. 14, 95 S.W.2d 365 (1936), approvingly quoted the following rationale from Thorton's treatise on the *Law of Oil and Gas*, with which language we fully agree:

> "The lessor usually knows nothing of the law applicable to such instruments; while the operator is usually well informed. Years of experience have shown the operator how to draw a lease giving him many advantages, of which the lessor has not even thought. For this reason the courts have adopted a rule to the effect to construe an oil or gas lease most favorably to the lessor, where its terms can be so construed without doing violence to the language used." 58 S.W.2d at 1039.

If Alpar's predecessor in interest had desired to limit the royalty payments under the lease to a fraction of the net proceeds received from the sale of the gas after allowance for a deduction of certain costs such as the cost of extracting hydrogen sulfide, it could have easily included express language to that effect in the lease. The ease with which such language could have been inserted in the lease agreement is demonstrated by the division order submitted by Alpar for the Wests' signatures. That document proposed that the royalty payments would be based on net proceeds and expressly listed the items of expense which would be deducted from gross proceeds to derive a net proceed figure.

■ We do not believe it is necessary in the instant case to attempt to determine whether expenses relating to the extraction of hydrogen sulfide or other expenses incurred by Alpar in marketing the gas fall within the category of "production expenses" or "processing expenses." Nor do we find it appropriate to determine whether or not the lease impliedly placed the royalty obligation at the well head rather than at the point of sale. Consistent with our view that the lease must be construed most strongly against Alpar, we conclude that the Wests are entitled to royalty payments based upon a percentage of the total proceeds received by Alpar from the sale of the gas without deduction for the cost of extracting hydrogen sulfide and without deduction for any other cost incurred by Alpar.

The question of whether or not the result of this interpretation is the most equitable or just is not dispositive of the issue in this case. It was within the power of Alpar's predecessor in interest, as lessee and drafter of the lease, to expressly provide for a deduction of expenses which it failed to do. Alpar, as the original lessee's successor in interest, must now be bound by the lease construed, as we have, to reflect a rational interpretation of its terms most favorable to the Wests, the original lessor's successors in interest.

### Contract Termination

■ The Wests assert that the lease terminated by its own terms upon Alpar's failure to make royalty payments to the Wests prior to the commencement of their lawsuit. The language of the lease applicable to this issue provides as follows:

> "It is agreed that this lease shall remain in force for a term of ten years from date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee, its successors and assigns:
>
> \*   \*   \*   \*   \*   \*
>
> The lessee shall pay lessor, as royalty, one–eighth of the proceeds from the sale of the gas, as such, for gas from wells where gas only is found and where not sold shall pay Fifty ($50.00) Dollars per annum as royalty from each such well, and while such royalty is so paid such well shall be held to be a producing well."

The lease was executed on September 30, 1969. By its own terms, the lease was to remain in force for a period of ten years from the date of execution and as long thereafter as oil or gas, or either of them,

was produced. The Wests assert that after the ten–year period had expired on September 30, 1979, the lease terminated by Alpar's failure to make royalty payments on the sale of the gas because, in the Wests' view, the well was no longer a "producing well" under the terms of the lease upon Alpar's failure to make such payments. We do not believe that the Wests have correctly interpreted this portion of the lease. Properly interpreted, the lease provides that upon the expiration of the ten–year period the lease continues in force for so long as oil or gas is actually being produced from the well. It also provides that the lease continues in force after the ten–year period "where gas only is found and where not sold" providing the lessee pays the lessor fifty–dollars per year. As long as oil or gas was actually being produced the well was a producing well and the contract remained in force. Alpar's failure to make royalty payments from the proceeds of the sale of the gas may have constituted a breach of the lease, but such failure to make payments did not cause the lease to terminate.

*Lease Cancellation*

■ The Wests also assert that the district court erred in refusing to cancel the lease under Section 47–16–39.1, N.D.C.C., based upon Alpar's failure to make royalty payments to the Wests prior to commencement of their lawsuit.

Section 47–16–39.1, N.D.C.C., provides:

"*47–16–39.1. Obligation to pay royalties–Breach.*–The obligation arising under an oil and gas lease to pay oil or gas royalties to the mineral owner or his assignee, or to deliver oil or gas to a purchaser to the credit of such mineral owner or his assignee, or to pay the market value thereof is of the essence in the lease contract, and breach of such obligation may constitute grounds for the cancellation of such lease in such cases where it is determined by the court that the equities of the case require cancellation. This section shall not apply when mineral owners or their assignees elect to take their proportionate share of production in kind, or in the event of a dispute of title

existing which would effect distribution of royalty payments."

In its order for judgment, the district court stated that equity would not permit a cancellation of the lease in this case under Section 47–16–39.1, N.D.C.C., because the royalty payments were legitimately disputed by the parties. In addition to the legitimate dispute between the parties as to the amount of royalty payments to be made, there is an additional circumstance which is pertinent to this issue. Subsequent to the commencement of the lawsuit, Alpar tendered, and the Wests accepted, royalty payments calculated on the basis of Alpar's interpretation of the lease. The Wests received such royalty payments subject to their claim for additional royalty payments based upon their interpretation of the lease, and, therefore, their acceptance of such royalty payments did not constitute a waiver of their claim. However, their acceptance of such royalty payments was inconsistent with their intent to and request for a cancellation of the lease under Section 47–16–39.1, N.D.C.C. Under such circumstances, we do not believe that the district court abused its discretion in determining that equity would not require a cancellation of the lease under Section 47–16–39.1, N.D.C.C.

The district court's dismissal of count I of the Wests' complaint is reversed and remanded with instructions to enter judgment for the Wests on that count consistent with the views expressed in this opinion. The district court's dismissal of count II is affirmed. The case is also remanded for further proceedings on the issues raised in count III of the Wests' complaint which were not determined by the district court's partial summary judgment nor considered by this Court on appeal.

SAND, VANDE WALLE and PAULSON, JJ., concur.

PEDERSON, Justice, concurring specially.

I concur, but only because of an apparent stipulation that "sour" gas has no market

493

value at the "wellhead."  If Montana–Dakota Utilities Company, instead of Alpar, had constructed the amine plant, the holding in this case would not be applicable.  In my opinion, "sour" gas at a "wellhead" is marketable and has a market value.