851 F.2d 206
 11 Fed.R.Serv.3d 771
 IMPERIAL OIL OF NORTH DAKOTA, INC., Roustabout Service
Company, Inc., and Lillian Y. Walters, Trustee for
William D. Walters, Jr., Appellees,
v.
CONSOLIDATED CRUDE OIL COMPANY, a/k/a Flying J. Exploration
and Production, Inc., Appellant.
 No. 87-5256.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 10, 1988.
Decided June 30, 1988.
 
 Philip K. Verleger, Los Angeles, Cal., for appellant.
 David A. Ranheim, Minneapolis, Minn., for appellees.
 Before LAY, Chief Judge, and McMILLIAN and FAGG, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 Consolidated Crude Oil Company, a/k/a Flying J. Exploration and Production, Inc. (Flying J), appeals from a final judgment entered in the District Court[1] for the District of North Dakota cancelling certain oil and gas leases between Flying J and Imperial Oil of North Dakota, Inc. (Imperial) pursuant to N.D.Cent.Code Sec. 47-16-39.1 (Supp.1985) due to Flying J's failure to make royalty payments to Imperial under the terms of the leases. Imperial Oil v. Consolidated Crude Oil Co., Civ. No. A4-82-12 (D.N.D. May 23, 1986). For reversal, Flying J asserts that the district court erred in cancelling the leases without resort to traditional equity principles and in the absence of indispensable parties. For the reasons discussed below, we affirm.
 
 
 2
 * Imperial is a small corporation, owned and managed by William D. Walters, Jr. and his wife, Lillian Walters. The corporation was organized in 1958 for the purpose of acquiring oil and gas interests for exploration and development. In 1965 and 1966 Imperial purchased mineral interests in Sections 34 and 35, Township 150 North, Range 97 West, McKenzie County, North Dakota (Sections 34 and 35). The mineral interests were subject to three oil and gas leases given by the prior owners of the minerals: (1) the "Jore lease," from Selma and Arthur Jore to Amerada Petroleum Corporation (Amerada); (2) the "Skjelvik lease," from Henry A. Skjelvik to Amerada; and (3) the "Johnson lease," from Robert E. Johnson to Amerada. Each lease provided that the lessor would retain a royalty interest of one-eighth of the proceeds from the production of any wells covered by the leases, free and clear of the costs of production. Imperial conveyed a small portion of the mineral interests to the other appellees, Roustabout Service Company, Inc. (Roustabout) and Lillian T. Walters, although Imperial continued to receive royalty payments from the lessees on their behalf.
 
 
 3
 In late 1965 Amerada recompleted a well in section 35 known as the Jore well. Under the leases described above, Imperial had a royalty interest in the Jore well. Under a separate agreement, Imperial also acquired a .258734 percent working interest in the Jore well. This interest entitled Imperial to a portion of the revenue from the well after subtracting a proportional amount of the expenses. After an initial period during which Imperial paid the working interest expenses directly to Amerada, the two agreed that Amerada would deduct the working interest expenses from the working interest revenue and pay the balance to Imperial. During the time that Amerada operated the Jore well Imperial received its royalty payments promptly.
 
 
 4
 In November 1971 Consolidated Crude Oil Company (Consolidated) acquired Amerada's interest in the section 34 and 35 leases, including the Jore well. Consolidated made seven royalty payments to Imperial during 1972; Imperial assumed that Consolidated had continued Amerada's practice of subtracting working interest expenses from working interest revenue. In early 1973, without explanation, Consolidated ceased making royalty and working interest payments to Imperial.
 
 
 5
 For a period of over four and one half years Consolidated failed to pay Imperial its royalties. Finally, in October 1977 Imperial sent William D. Walters, Jr., an attorney and vice president of Imperial, to Minot, North Dakota, to inquire of Consolidated regarding its failure to pay royalties. Walters, Jr. met with Richard Palmer, the production accounting manager for Consolidated. Palmer was able to determine Imperial's interest in the Jore well, but told Walters, Jr. that he believed Imperial had not been paid because Imperial had failed to pay its working interest expenses to Consolidated. Walters, Jr. explained to Palmer that Consolidated could easily deduct the working interest expenses from the amount owed to Imperial and make payment on the balance. Palmer indicated that any decision on making the royalty payments would need to be made by Andrew Morgan, Consolidated's vice president of production operations in Billings, Montana. Walters, Jr. responded that if Consolidated did not pay the royalties, Imperial would consider the leases cancelled.
 
 
 6
 After the October 1977 meeting with Palmer, Imperial heard nothing from Consolidated for six months. On April 14, 1978, Imperial sent Walters, Jr. to meet with Morgan in Billings. Walters, Jr. informed Morgan that, as an attorney, he did not believe Consolidated could refuse to pay Imperial its royalty payments under the leases due to the failure of Imperial to pay Consolidated working interest expenses. Walters, Jr. again stated that if Imperial were not paid its royalty interests it would consider the leases cancelled. Morgan agreed that it was improper for Consolidated to withhold the royalties and informed Walters, Jr. that the royalties would be paid as soon as possible. Morgan represented that Consolidated would either deduct the working interest expenses from the amount of the royalties due or else pay the full amount of the royalties.
 
 
 7
 A week after this meeting between Walters, Jr. and Morgan, Imperial received a letter from Palmer stating that Consolidated would not pay Imperial the royalties it owed until Imperial: (1) paid all the working interest expenses it owed, (2) executed a division order,[2] and (3) furnished an attorney's title opinion showing that the royalty interest was free of liens. After reviewing the letter, Imperial informed Consolidated that the conditions were unacceptable and in bad faith for several reasons. First, there was no justification for tying the working interest expenses to the payment of royalties--a point already conceded by Morgan. Also, the working interest expenses were minimal in comparison to the amounts owed Imperial and could have simply been deducted from the payments owed to Imperial.[3] Second, Consolidated did not point to any specific problem necessitating a title opinion, and the cost of such an opinion likely would have exceeded the royalties due Imperial. The testimony at trial revealed that there was nothing in Consolidated's files that indicated a title problem and that between 1972 and 1981 Consolidated did not require any other royalty interest owner to furnish an attorney's title opinion or prove that no liens existed. In spite of the October 1977 and April 1978 warnings that the failure of Consolidated to pay royalties to Imperial would result in cancellation of the leases, and Imperial's explicit rejection of Consolidated's three conditions for payment, Consolidated did not pay the royalties or communicate with Imperial for three years.
 
 
 8
 In April 1980 Flying J purchased the stock of Consolidated, and in 1981 the name of the company was changed from Consolidated to Flying J. In February 1981 Flying J informed Imperial that it planned to drill a new well, the Skjelvik well, on section 35 and requested that Imperial execute a "farmout" agreement with Flying J.[4] Several weeks later Flying J renewed its request for Imperial to execute the farmout and notified Imperial that the Skjelvik well had been spudded. Imperial responded two weeks later on April 24, 1981. In this communication, Imperial refused to execute the farmout, denied Flying J permission to proceed with drilling the well, and reminded Flying J that it considered the leases cancelled due to the non-payment of royalties.
 
 
 9
 After several months of silence, Clarence Neal, Corporate Counsel for Flying J, sent Imperial a letter on September 11, 1981, requesting documentation of Imperial's mineral interests in section 35. Imperial responded that it considered the leases cancelled and, on September 18, 1981, filed a demand for release of the leases with the McKenzie County Register of Deeds. Although Imperial was unaware of it at the time, Flying J had completed the Skjelvik well on the previous day, September 17, 1981. On September 22, 1981, Flying J responded to Imperial's demand for release of the leases by denying that they had been terminated or forfeited. On several occasions during November and December 1981 Flying J attempted to tender the royalty payments to Imperial, but Imperial refused to accept payment. Imperial filed an action seeking cancellation of the leases on January 27, 1982.
 
 
 10
 Effective January 1, 1982, Amoco Production Company (Amoco) became the crude oil purchaser for Flying J's North Dakota interests and was therefore responsible for making royalty payments on the Jore and Skjelvik wells. In July and November 1982 Amoco sent Imperial division orders purporting to be effective January 1, 1982. Imperial refused to execute either order. Amoco at this time had a policy of requiring an executed division order before it would distribute royalties to a mineral owner. Relying on this policy, Imperial assumed that Amoco would not pay it royalties on the Skjelvik well. Amoco changed its policy in January 1983 although Imperial was not aware of the change.
 
 
 11
 In April 1984 Amoco contacted Imperial concerning its refusal to execute a division order for the Skjelvik well. Imperial informed Amoco that it considered the leases cancelled and that Amoco should not make payments on Imperial's interests in the Jore and Skjelvik wells. In November 1984 Imperial learned from Flying J's pre-trial brief that Amoco had been making royalty payments to Imperial on the Skjelvik well since March 1983. Imperial had been unaware of these payments because they were included in payments from Amoco concerning numerous other properties. Imperial immediately returned to Amoco the amounts paid to Imperial as royalties on the Skjelvik well.
 
 II
 
 12
 In the district court, Imperial sought cancellation of the leases governing the Jore and Skjelvik wells due to non-payment of royalties on the basis of N.D.Cent.Code Sec. 47-16-39.1 (Supp.1985), which provides:Obligation to pay royalties--Breach. The obligation arising under an oil and gas lease to pay oil or gas royalties to the mineral owner or his assignee, ... is of the essence in the lease contract, and breach of such obligation may constitute grounds for the cancellation of such lease in such cases where it is determined by the court that the equities of the case require cancellation.... This section shall not apply ... in the event of a dispute of title existing which would effect distribution of royalty payments.
 
 
 13
 Flying J responded that this statute did not apply because a dispute of title existed which affected distribution of royalty payments. In support of this argument, Flying J pointed to (1) the assignment of small portions of Imperial's interests to Roustabout and Lillian T. Walters and (2) the refusal of Imperial to execute a division order in April 1978. The district court rejected Flying J's argument because it found that Flying J was unaware of the partial assignments of Imperial's interests and the absence of a division order did not amount to a title dispute. Imperial Oil v. Consolidated Crude Oil Co., slip op. at 14-15.
 
 
 14
 The district court next discerned from a review of North Dakota law six factors to be considered in determining whether cancellation is an appropriate remedy for nonpayment of royalties:
 
 
 15
 (1) whether the lessee consistently made payments according to the provisions of the lease; (2) whether the failure to pay royalties resulted from the lessee's negligence; (3) whether the lessee acted in good faith; (4) whether the lessor failed to notify the lessee of the nonpayment and therefore has unclean hands; (5) whether the lessee attempted to remedy the deficiency after learning of the nonpayment; and (6) whether the lessor accepted payment.
 
 
 16
 Id. at 18. Applying these factors, the district court concluded that the equities of the case required cancellation of the Jore and Skjelvik leases as of April 30, 1978, the date when Imperial rejected Consolidated's demand for payment of working interest expenses and a title opinion and informed Consolidated that it considered the leases cancelled. This appeal followed.
 
 III
 
 17
 Flying J argues that the district court erred in cancelling the leases for essentially three reasons: (1) the district court failed to apply traditional principles of equity, (2) Imperial was barred from recovery by the doctrine of laches, and (3) the district court entered judgment without the participation of indispensable parties. We consider these arguments seriatim.
 
 
 18
 * Flying J's equity argument is essentially that cancellation of the lease was not "fair" and that it results in a "windfall" to Imperial. Flying J asserts that because cancellation is traditionally an equitable remedy, Imperial should have been required by the district court to demonstrate that a legal remedy such as damages would have been inadequate. This is so, according to Flying J, because cancellation of the leases renders a forfeiture, and equity abhors a forfeiture.
 
 
 19
 It is true that the cancellation of the leases caused a forfeiture. The district court estimated the loss to Flying J caused by the cancellation to be approximately $691,463.00. Slip op. at 12. The cancellation, and accordingly, the loss, was caused by Flying J's failure to pay Imperial slightly more than $12,000.00 in royalties. This remedy is undoubtedly harsh and one that may not obtain under common law principles of equity considered alone. But Flying J's equity argument overlooks the critical element of this case: the applicable North Dakota statute.
 
 
 20
 Section 47-16-39.1 represents a judgment by the North Dakota legislature that traditional damage remedies are simply inadequate to protect mineral owners' royalty interests. Accordingly, traditional principles of equity do not apply here; the legislature has supplanted common law equity with its own weighing of equitable principles and has determined that the nonpayment of royalties may be grounds for cancellation of a mineral lease. This conclusion is clear from a review of the legislative history of Sec. 47-16-39.1, which reveals that the statute was enacted as a means of increasing the bargaining power of landowners in their dealings with major oil companies concerning rights under oil and gas leases. A legislative research committee drafted the initial form of the statute. This committee attached to its proposed legislation a report on its study of North Dakota oil and gas law and its recommendations regarding the need for legislation. In this report, the committee stated that it "deemed it desirable to better protect correlative rights by finding ways to more nearly equalize the bargaining power of the landowners when dealing with major oil companies in matters relating to rights under oil and gas leases." Legislative Research Comm., Report to the Legislature, at 42 (1961). Accordingly, the committee's recommendations included:
 
 
 21
 a bill to make the obligation to pay oil and gas royalties due a mineral owner the essence of the lease contract and to make the breach of the obligation to promptly pay such royalties grounds which the court, in its discretion, might use as the basis for cancellation of the oil and gas lease. A number of land owners reported at times there appeared to be an unreasonable lag in the payment of royalties and since their only apparent remedy was to sue in the courts for a recovery of the royalties due, they felt this was not sufficient penalty to ensure conscientious efforts to make prompt payments. In the Committee's opinion, the proposed bill would make the failure to promptly pay royalties a more serious matter. [B]ut since cancellation would be of the discretion of the courts, it would not unduly penalize a lease operator if he has reasonable grounds for failing to make prompt payment.
 
 
 22
 Id. On the basis of this legislative history, the district court concluded that the North Dakota legislature intended to make cancellation available as a remedy for the nonpayment of royalties in appropriate cases even where a damages remedy might be adequate. Substantial deference is due the district court's interpretation of the law of the state in which it sits, Union National Bank v. Farmers Bank, 786 F.2d 881, 885 (8th Cir.1986), and we find no error in the district court's interpretation of N.D.Cent.Code Sec. 47-16-39.1.
 
 
 23
 The district court then concluded that cancellation was an appropriate remedy in this case. Flying J argues the district court failed to give sufficient weight to equitable principles. We have already discussed the legislative substitution for equitable principles embodied in N.D.Cent.Code Sec. 47-16-39.1; it therefore remains only to determine whether the district court abused the discretion contemplated under the statute in ordering cancellation in this case. See West v. Alpar Resources, Inc., 298 N.W.2d 484, 492 (N.D.1980) (cancellation remedy under this statute within discretion of trial court).
 
 
 24
 We conclude that cancellation was the appropriate remedy. Over a period of several years, Consolidated, and later Flying J, simply refused to make royalty payments to Imperial. The failure to pay was intentional; there has never been any suggestion that Consolidated or Flying J was unaware of its obligation to pay royalties, and this refusal to pay continued in spite of Imperial's repeated explicit requests for payment. Flying J's refusal to pay was occasionally accompanied by signs of bad faith. Even though Morgan conceded to Imperial that it was improper to withhold royalty payments due to the nonpayment of working interest expenses, Flying J later refused to pay the royalties until Imperial both paid its working interest expenses and furnished an attorney's title opinion that could have exceeded in cost the value of the royalties. These demands were not reasonable.
 
 
 25
 Imperial notified Flying J on several occasions of the nonpayment of royalties and of Imperial's position that it considered the leases cancelled. All of Imperial's actions were consistent with its position that it considered the leases cancelled. Although at one time Imperial accepted royalty payments from Amoco, Imperial was unaware that the payments included royalties for the Skjelvik well at the time of acceptance, and immediately returned those payments when made aware of them. Cf. West v. Alpar Resources, Inc., 298 N.W.2d at 492. (state trial court did not abuse discretion in denying cancellation under N.D.Cent.Code Sec. 47-16-39.1 where royalty payments in dispute and lessor accepted royalty payments in amount inconsistent with request for cancellation).
 
 
 26
 The facts of this case, from start to finish, fall squarely within the problem that the North Dakota legislature attempted to remedy through the passage of N.D.Cent.Code Sec. 47-16-39.1: the unjustified refusal or failure of a lessee oil company to make royalty payments to their lessor mineral owners. Indeed, after several years of litigation and seventy-six pages of briefing offered to this court, Flying J has yet to offer any good faith explanation for why it did not simply pay Imperial its approximately $12,000 in royalties. The district court did not abuse its discretion concluding that cancellation was an appropriate remedy in this case.
 
 B
 
 27
 Flying J nevertheless argues that even if cancellation is an appropriate remedy in this case, Imperial is barred from seeking this remedy by the doctrine of laches because Imperial waited until 1978 to notify Consolidated of the nonpayment of royalties and did not file for release of the leases until September 18, 1981.
 
 
 28
 Under North Dakota law,
 
 
 29
 [l]aches does not arise from a delay or lapse of time alone, and in addition to the time element, the party against whom laches is sought to be invoked must be actually or presumptively aware of his right and must fail to assert them against a party who in good faith permitted his position to become so changed that he could not be restored to his former state.
 
 
 30
 Burlington Northern, Inc. v. L.P. Hall, 322 N.W.2d 233, 242 (N.D.1982). Flying J failed to demonstrate any good faith change in position in reliance on Imperial's failure to assert its rights. There is no evidence that Consolidated in any way changed its position in reliance on Imperial's failure to demand royalty payments before 1978. After 1978, Imperial expressly informed Consolidated and Flying J that it considered the leases cancelled. Accordingly, even if Flying J detrimentally changed its position by drilling the Skjelvik well in 1981, Flying J could not have done so in good faith reliance on Imperial's actions. The district court did not err in concluding that the doctrine of laches did not bar Imperial from cancelling the leases effective April 30, 1978.
 
 C
 
 31
 Finally, Flying J argues that the district court's entry of judgment violated Fed.R.Civ.P. 19 because it affected the interests of parties to whom Flying J had farmed out interests in the leases who were not made parties to this action. The assignees of Flying J, however, were not parties to the leases between Imperial and Flying J; the assignees were merely assigned an interest in Flying J's rights under the leases. Any difficulty regarding Flying J's interest in the leases is a matter to be resolved between Flying J and its assignees and does not concern Imperial or the underlying cancellation dispute. Flying J's assignees were not indispensable parties to this action.
 
 
 32
 The judgment of the district court is affirmed.
 
 
 
 [1]
 The Honorable Bruce M. Van Sickle, United States Senior District Judge for the District of North Dakota
 
 
 [2]
 A "division order" is an agreement between the lessor and lessee of an oil well providing for the payment to the lessor by the lessee for the value of the lessor's interest in the oil, rather than payment to the lessor in kind
 
 
 [3]
 The total working interest expenses due Consolidated at this time were $390.39, while Consolidated owed Imperial $737.12 in working interest revenue and $5,694.87 in royalties
 
 
 [4]
 A "farmout" is an agreement whereby a lessor who does not desire to bear the entire burden of drilling a well agrees to assign a portion of his or her interest to another entity who is willing to share in the cost. See H. Williams & C. Myers, Manual of Oil and Gas Terms 307 (6th ed. 1984)