**Norman E. SONDROL and Marlene J. Sondrol, Plaintiffs,**

v.

**PLACID OIL CO., Defendant.**

**No. A4–91–175.**

United States District Court, D. North Dakota, Northwestern Division.

Feb. 16, 1993.

Kent A. Reierson, Williston, ND, for plaintiffs.

Ernest R. Fleck, Bismarck, ND, for defendant.

## MEMORANDUM AND ORDER

CONMY, District Judge.

This case revisits the gas well production contracts which were on the periphery of the recent "take or pay" natural gas purchase contracts. A short historical review is in order. At one time utility companies and pipe line companies held the opinion that with the deregulation of the natural gas industry, the market price would jump up dramatically and supplies would also become scarce.

As a result of that belief, many companies entered into "Take or Pay" purchase contracts whereby they locked in a supply of natural gas by agreeing to take the entire production of the processing plants. These contracts typically also had language defining the method of computing price increases, but no method for decreasing the purchase prices. These agreements were of greater significance in the areas which produced "sour" gas, as it was necessary to build processing plants to remove the hydrogen sulphide—a significant investment.

It has been this court's observation in previous cases that the royalty agreements and many of the other forms of contract used were initially drafted for use in "sweet gas"

areas, containing provisions authorizing the well owner to tap into the gathering lines for a free supply of gas for household use and generally being silent as to responsibility for paying the costs of making "sour" gas marketable. No one would want to tap into a sour gas system as the product as this point is highly corrosive and potentially lethal without warning if leakage should occur.

Natural gas, after deregulation, rather than increasing in price, decreased sharply in spot or market price and the supply far outstripped the demand. The utilities which had contracted with the processing plant operators began to either default or renegotiate the take or pay contracts. The processing plant operators, unable to receive payment for the gas processed, were unable to pay the gas well royalty owners or were forced to shut in the gas wells. In some instances, rather than shut down either an oil and gas producing well or simply a gas well, the processing company agreed that the utility or pipeline company could put the gas into "storage" and defer payment until the gas came back out of storage.

In this case, Placid Oil operated the gas well, selling to Koch Industries, who owned the gathering system and processing plant, who in turn had a take or pay contract with Montana Dakota Utilities which used its wholly owned subsidiary pipeline company for movement of the gas from the processing plant. MDU, while not paying for the gas produced, did agree that it be placed into storage. The gas ultimately was removed from storage and sold by Placid Oil, who then caused payment to be made to the plaintiffs for the percentage of the ultimate payment received.

Sweet gas may require compression in order to effect delivery into a gathering system. Sour gas may require compression and certainly requires processing to remove the compounds not wanted in "dry" gas sold to utilities. The products removed in the processing are sold also. Typically a portion of the gas produced is used to power the compressors and other costs of processing are charged back to the well operator and through the well operator to the royalty holder. If the BTU rating of the gas is higher than the contract requirements, an inert gas may be "injected" reducing the BTU levels and increasing the volume of the gas delivered.

Plaintiffs in this case claim:

1. "Title" to the gas passed to Koch when delivered to the processing plant, immediately triggering a requirement that the royalty holders be paid based on a percentage of "market value", at that time, not a percentage of the final sale price when the gas was ultimately withdrawn from storage.

2. The contract is ambiguous, and when strictly construed against Placid Oil's predecessor in interest, does not provide for the deduction from "proceeds" of the charged back costs of compression and processing.

3. North Dakota's statutory provision for 18% interest on unpaid mineral royalty interests really makes the suit worthwhile.

The plaintiffs have moved for partial summary judgment on all issues but the determination of what the "market value" of the gas delivered at the well head would be, relying primarily on the North Dakota Supreme Court decision in *West v. Alpar Resources, Inc.*, 298 N.W.2d 484 (1980). The Court is of the impression that such reliance may be misplaced.

In West, the well operator and treatment plant operator were the same entity. Alpar Resources collected a sum from the buyer, deducted processing expenses, and remitted a percentage of a lesser sum to the royalty holder, West. In the present case, Placid Oil is remitting to the royalty holder the percentage of the gross amount which it receives, Koch hydrocarbon having already deducted the processing, compression and injection expense before delivering "proceeds" to Placid Oil. In West, the parties had apparently also stipulated that wet or sour gas had no market value "at the well head".

The specific contract language involved is: "Lessee agrees to pay lessor ⅛ of the proceeds received for gas sold from each well where gas only is found, or the market value at the well of such gas used off the premises"

"Lessee agrees to pay lessor ⅛ of the market value at the well for gas produced from any oil well and used off the premises, or for the manufacture of casing head gasoline or dry commercial gas."

The exhibits contain a statement for the month of December of 1984 and reference to it illustrates the disagreement most clearly. Recovered liquids through the processing plant:

| | |
|---|---|
| propane | $ 4,061.81 |
| butane | 2,597.03 |
| gasoline | 6,024.76 |
| Dry gas residue, gross | 89,177.09 |
| Gross value | 101,860.00 |
| less process fee | ( 28,174.03) |
| fuel fee | ( 1,341.79) |
| Net value | 72,344.87 |
| less dry gas not sold by Koch and placed into storage | ( 40,620.50) |
| Net value upon which royalty computed and paid | 31,724.37 |

⅙ × 31,724.37 = 5,287.00—as opposed to plaintiffs' claim of ⅙ × 101,860 = 16,976.00 (or whatever plaintiff may be claiming as it appears that the "gross value" total shown above already had taken from it a 25% processing fee before the deduction for yet another processing fee, so the plaintiff may actually be claiming an entitlement of ⅙ of $135,812 or $22,635 for this month instead of either of the figures quoted above if market value is applicable and the figure shown which is multiplied by .75 is deemed to be the "market value".) Many months are involved.

Defendant moves for summary judgment, claiming that the well is a "gas only" well for purposes of the lease and that the obligation is then to distribute only the ⅙th of the proceeds actually received, and that it has in fact done that.

There appears to be no dispute that Placid did distribute the royalty percentages on all dollar proceeds which it received. Plaintiffs appear to argue that inasmuch as "title" to the gas passed to Koch, Placid received a "credit" for the gas which went into storage for the amount of dollars deducted on the monthly statements, and that this "credit" is either a reflection of "market value" or is "proceeds". Unfortunately it does not necessarily follow that the "credit" has any distributable value.

In the reply to the defendant's motion for summary judgment, Plaintiffs contend that the stored gas was "used off of the leased premises" and that "market value" at the well should apply rather than "proceeds".

Plaintiffs appear to translate "used off of the premises" to apply to any gas for which cash "proceeds" were not immediately paid.

While not specifically relevant, the court cannot help but ponder the difficulties in trying to establish a market value for a product which is not marketable other than as supply to a processing plant which in turn cannot find a market for the processed dry gas, all complicated by the requirement for pipelines to move any of the product from well, to processing plant, to buyer. It appears very reasonable to conclude that market value is the amount one can sell it for, and that if it cannot be sold it has no value unless and until a buyer can be found. If in fact the buyer will only pay for processed gas, then the market value of unprocessed gas is lower by the net cost amount required to process it. This appears to be a file where the court could well determine that both sides win, yet nothing changes.

The court accepts the positions taken by the defendant. The well is a "gas only" well and the "proceeds" clause applies. The defendant has remitted all proceeds received by it to the Plaintiffs.

The North Dakota ruling in *West v. Alpar* is clearly distinguishable on the facts involved as it speaks to the costs of processing and compression, in that Alpar deducted those costs from its "proceeds". Here, the price or proceeds received and distributed by Placid were passed through as received, without deduction. No claim is made that the purchase and sale agreement between

Placid and Koch Hydrocarbon was not an arms length valid agreement.

Plaintiffs' counsel makes much of the passage of "title" to the gas to Koch at the well head, thus creating a "sale" triggering either the remittance of "proceeds" or "market value at the well". All proceeds have been remitted. A sale which produces no "proceeds" does not trigger any payment requirement. Assuming for purposes of argument, that an immediate obligation to remit a royalty based upon "market value" was triggered, the net result might well be that plaintiffs have been overpaid through the ultimate sale of the gas placed into storage.

It is difficult to believe that any "expert" could or would pontificate regarding market value based upon some regional spot market prices or FERC price approvals under the specific fact pattern presented here. MDU had defaulted on its take or pay contracts with Koch. Koch could not market or even transport the gas. The only pipeline from the well ran to Koch's plant. The only pipeline away from Koch's plant was owned by a MDU subsidiary and regulated by FERC.

Defendant's cross motion for summary judgment is granted (doc. 22). The action is ordered dismissed, with prejudice.

**SO ORDERED.**