Joan L. SAVAGE, Plaintiff–Appellee
and Cross–Appellant,

v.

WILLIAMS PRODUCTION RMT COM-
PANY, successor by merger to Barrett
Resources Corporation, Defendant–Ap-
pellant and Cross–Appellee.

No. 04CA0792.

Colorado Court of Appeals,
Div. III.

Oct. 20, 2005.

Certiorari Denied Aug. 14, 2006.

Dufford Waldeck Milburn & Krohn LLP, Christopher G. McAnany, Nathan A. Keever, Grand Junction, Colorado, for Plaintiff–Appellee and Cross–Appellant.

Davis Graham & Stubbs LLP, Eugene A. Lang, Jr., Anthony J. Shaheen, Denver, Colorado, for Defendant–Appellant and Cross–Appellee.

HAWTHORNE, J.

In this case involving royalty payments from various oil and gas leases, the working interest owner, Williams Production RMT Company, appeals the trial court's judgment that it was improper for its predecessor in interest, Barrett Resources Corporation, to deduct processing and transportation costs from the royalty payments made to the royalty interest owner, Joan Savage. Savage cross-appeals the trial court's application of the marketability test and its ruling that Williams could deduct from the recalculated royalty payments certain amounts for severance and ad valorem taxes. We reverse the judgment with respect to the taxes and otherwise affirm.

## I. Background

Savage owns mineral rights in the Piceance Basin in western Colorado that are subject to various oil and gas leases. Barrett succeeded to the lessee interest under several of the leases and also acquired one lease directly from Savage. Williams succeeded Barrett as the lessee as a result of a merger with Barrett in 2001.

Savage sued Barrett to recover unpaid royalties. She alleged that Barrett had underpaid royalties by failing to account for all production obtained from the wells, by improperly calculating the sales price reportedly received by Barrett for the gas, and by improperly deducting costs incurred in gathering and transporting the gas.

Barrett conceded that it had improperly calculated the royalties and admitted nonpayment of royalties on some wells. However, Barrett disputed that the deductions were improper and proceeded to a trial before the court on that issue.

The court determined that the deductions for processing costs and transportation were improper. It ordered Barrett to recalculate the royalties to correct its error in calculating the royalties at an improper price, its error in not paying royalties on some of the wells, and its error in deducting costs for processing and transportation.

Based on the court's order, Barrett recalculated the royalties, but then reduced the amount that it owed Savage by deducting severance and ad valorem taxes. Savage objected to the tax deduction, but the trial court ruled that withholding the amount of those taxes from the judgment was proper.

## II. Interpretation of the Leases

■ Savage contends that it was unnecessary for the court to apply a marketability analysis because the leases provided for the allocation of those costs. We conclude that the leases were silent as to allocation of costs, and therefore, the trial court correctly applied a marketability analysis.

■ The interpretation of a contract is a question of law that we review de novo. *B & B Livery, Inc. v. Riehl*, 960 P.2d 134 (Colo. 1998). When the contract is an oil and gas lease, a royalty clause should be construed in its entirety and in light of the fact that it is the means by which the lessor receives the primary consideration for the lease. *Rogers v. Westerman Farm Co.*, 29 P.3d 887 (Colo. 2001). In the context presented, the generally accepted rule is that oil and gas leases are strictly construed against the lessee and in favor of the lessor. *Davis v. Cramer*, 837 P.2d 218 (Colo.App.1992).

Although this action was based on eight leases, it is undisputed that one of the leases was silent regarding the allocation of costs. The royalty clause in the other seven leases provided, "The lessee shall pay lessor, as royalty, one-eighth of the proceeds from the sale of gas, as such for gas from wells where gas only is found."

Savage contends that because she is entitled to a portion of the "proceeds" from the sale of gas, she is entitled to that portion of the "total proceeds" from the sale. In other words, Savage asserts that she is entitled to one-eighth of the total revenue received, and therefore, any deductions taken from that amount were improper.

Savage cites cases from other states that support her interpretation. *See Hanna Oil & Gas Co. v. Taylor*, 297 Ark. 80, 759 S.W.2d 563 (1988)(although costs were not specifically mentioned in the language of the lease, costs were not deductible because "proceeds" generally means "total proceeds"); *West v. Alpar Res., Inc.*, 298 N.W.2d 484 (N.D. 1980)(lease that did not provide for the allocation of costs was ambiguous, and must be construed against the lessee; therefore, deductions for those costs were improper).

■ However, after considering *Hanna Oil* and *West*, the supreme court in *Rogers* concluded that a marketability analysis applies "[a]bsent express lease provisions addressing [the] allocation of costs." *Rogers, supra*, 29 P.3d at 906. Under a marketability analysis, a court determines when the gas is first marketable. This determination is necessary to resolve the allocation of costs between the parties. The lessee must bear the costs necessary to make the gas marketable. However, once the gas is marketable,

any additional costs incurred are shared by the lessor and the lessee. *Rogers, supra.*

In *Rogers,* the supreme court considered the following language from four different leases to determine whether they provided for the allocation of costs:

> (1) one-eighth of the gross proceeds received from the sale ... sold at the mouth of the well or, if not sold at the mouth of the well, then one-eighth of the market value thereof at the mouth of the well;
> (2) one-eighth of the proceeds from the sale of gas ... at the mouth of the well;
> (3) one-eighth, at the market price at the well for the gas sold; and
> (4) one-eighth of the proceeds received for gas sold from each well ... or the market value at the well of such gas used off the premises.

*Rogers, supra,* 29 P.3d at 891 n. 1.

In its analysis, the *Rogers* court focused on whether the phrases "at the mouth of the well" and "at the well" provided for the allocation of costs between the parties.

The court concluded that all four leases were silent regarding the allocation of costs because none of the leases described how the costs should be allocated, if at all, between the parties. The court further concluded that "[i]n a proceeds type lease, the instrument should specify either the place where royalties are to be calculated, or the expenses to which the lessor is subject." *Rogers, supra,* 29 P.3d at 898.

Here, the relevant language of the leases provided "one-eighth of the proceeds from the sale of gas." This language is similar to that of the Type II lease in *Rogers,* except that it does not contain the phrase "at the mouth of the well." Regarding the Type II lease, the *Rogers* court concluded, "[T]his language does not provide any guidance in calculating a royalty payment for gas sold anywhere other than at the physical location of the well. Accordingly, this lease language not only fails to allocate costs between the parties, it fails to address costs in any sense." *Rogers, supra,* 29 P.3d at 898.

Here, the lease language is even less specific than the language of the Type II lease in *Rogers.* Accordingly, we conclude that nothing in this language described the allocation of costs, if any, between the parties. Nor did the language describe where royalties were to be calculated or specify any expenses to which Savage is subject.

Therefore, the leases were silent with regard to the allocation of costs, and the trial court properly applied a marketability analysis to determine the allocation of costs between the parties. *See Rogers, supra* (to determine allocation of costs where the lease language is silent, the court must determine when the gas is marketable).

## III. Marketability

■ Williams contends that the trial court applied the wrong legal standard to determine when the gas was first marketable. We disagree.

■ Colorado follows the rule that a lessee has an implied duty to market gas produced under an oil and gas lease. Under the implied covenant to market, a lessee is obligated to incur those costs necessary to render the gas marketable. *Garman v. Conoco, Inc.,* 886 P.2d 652 (Colo.1994). As noted, under the general rule of the implied covenant of marketability, "costs incurred after a marketable product has been obtained, that either enhance the value of the product or cause the product to be transported to another location, are shared by the lessee and the lessor." *Rogers, supra,* 29 P.3d at 900.

■ To determine whether gas is marketable, the court must consider two factors, condition and location. Whether the gas is in a marketable condition depends on whether it is "in the physical condition where it is acceptable to be bought and sold in a commercial marketplace." *Rogers, supra,* 29 P.3d at 905. The location is "the commercial marketplace," which is defined as "the region in which any commodity or product can be sold; the geographical or economic extent of commercial demand." *Rogers, supra,* 29 P.3d at 905 (quoting *Black's Law Dictionary* 970 (6th ed.1990)).

To understand fully Williams's contention, it is necessary to discuss the relevant history of the oil business in the basin.

In 1984, Barrett drilled six exploratory wells in the basin. At that time, there were only a few wells in the entire basin, none of which was located where Barrett drilled. After discovering gas in five of the wells, Barrett needed to find a market for the gas. A Barrett representative approached Questar Mountain Fuel about purchasing the gas. Questar was willing to either lay a pipeline system to the wellhead and buy the gas there, or buy the gas at the injection point into its mainline. Barrett rejected Questar's offer and decided to build its own gathering system, the Grand Valley Gathering System (GVGS), to transport its gas from the wellhead to Questar's pipeline.

From 1985 to 1989, Barrett's gas production steadily increased. In 1989, Barrett began to market its gas outside of the basin, and in 1990, it acquired the leases at issue here.

The trial court found that the gas was not marketable at the wellhead because it had to be processed and transported to the pipeline before it could be sold. The trial court determined that the deductions were improper because under the implied duty to market, Barrett was responsible for those costs.

Williams contends that this conclusion is erroneous because Questar offered to purchase gas produced in the basin at the wellhead in 1984, and therefore, it was marketable at that point. Williams further asserts that any costs incurred after the gas left the wellhead were either to improve or transport the product, and under *Rogers*, these costs are to be shared by the lessor and the lessee.

Initially, we note that Williams contends that the appropriate time to determine the marketability of the gas was at the time of Questar's offer in 1984. However, because we agree with the trial court that the gas was not marketable at that time, we need not address the issue of whether that was the appropriate point to determine marketability.

In addition, the supreme court stated, and Williams concedes, that "[g]as is not marketable merely because it is sold." *Rogers,*

*supra,* 29 P.3d at 910. The court recognized that although "a single purchaser ... is evidence that there is a market for the gas," such a purchase does not conclusively establish a market. *Rogers, supra,* 29 P.3d at 910.

Therefore, the offer by Questar to purchase gas at the wellhead was merely evidence to be considered in determining whether there was a commercial market for the gas.

Here, the trial court considered the condition of the gas and whether there was a market to sell the gas in determining whether it was marketable. The court found that "the gas was marketable only after processing and transportation to the interstate pipeline connection in a condition that made it acceptable for delivery into said pipelines." The court further determined that "the interstate pipeline gave access to the only reasonable markets except for a very small amount of gas that was sold unprocessed to local consumers in the basin including direct connections from wells to a few homes."

We conclude that the trial court applied the correct legal standard by considering the evidence of Questar's offer, the condition of the gas at the wellhead, and the commercial realities of the marketplace. *See Rogers, supra.*

## IV. Sufficiency of the Evidence

 Williams contends that even if the trial court applied the correct legal standard for marketability, it erred by determining that there was almost no market for the gas in the basin because there was no evidence in the record to support that finding. We disagree.

 The determination of marketability is a question of fact. *Rogers, supra.* We will not disturb the trial court's factual findings unless they are so clearly erroneous as not to find support in the record. *Parr v. Triple L & J Corp.,* 107 P.3d 1104 (Colo.App. 2004).

At trial, Williams's director of the Piceance Basin Asset had the following exchange with Savage's attorney:

Savage's Attorney: Have other companies done the same thing as Barrett has done, in terms of creating an infrastructure [to transport and process gas]?

Director: No.

Savage's Attorney: Has that created problems for them?

Director: Yes.

The director then testified that "Barrett [w]as being asked to process gas for other operators and move gas on [its] Grand Valley Gathering System." The director testified that this was so "because [the other operators] are constrained, [they] can't move their gas. They're shut in." Savage's attorney asked the director why they could not move their gas, and the director replied, "Because they don't have any type of market, other than Questar ... [and] Questar is at capacity." When asked what that meant to be at capacity, the director responded that "that means they basically can't take any more gas than what we're taking today. And the producers have no place to go with their gas." The director further testified that "being shut in" meant that the gas was "not being sold."

Moreover, both the director and a petroleum engineer expert witness testified that the local demand for gas at the wellhead was only a small fraction of Barrett's total production.

We conclude that there was sufficient evidence in the record from which the trial court could have determined that there was almost no commercial market for the gas in the basin. *See Parr, supra.* Accordingly, the trial court did not err in finding that the gas was not marketable at the wellhead.

### V. Severance and Ad Valorem Taxes

Finally, Savage contends on cross-appeal that the trial court erred in considering Williams's claim for severance and ad valorem taxes because it was a compulsory counterclaim that Williams failed to raise in its pleadings or at trial. We agree.

Where a compulsory counterclaim is not affirmatively pleaded or otherwise put at issue at trial, the court is precluded from rendering a finding regarding that claim.

C.R.C.P. 13(a); *Corbin Douglass, Inc. v. Kelley,* 28 Colo.App. 369, 472 P.2d 764 (1970).

A setoff is defined as "[a] debtor's right to reduce the amount of a debt by any sum the creditor owes the debtor." *Black's Law Dictionary* 1404 (8th ed.2004). A setoff is a counterclaim and is compulsory if it arises from the same subject matter or occurrences as the previous claim. *Corbin, supra.* "Whether a counterclaim is compulsory involves inquiry into the logical relationship between the opposing claims." *Grynberg v. Rocky Mountain Natural Gas,* 809 P.2d 1091, 1093 (Colo.App.1991). In addition, a counterclaim may be compulsory even though the evidence needed to establish it differs from the evidence needed to establish the other prior claim. *Grynberg, supra.*

Here, Williams had previously paid the taxes at issue, and any claim that Williams had against Savage regarding severance and ad valorem taxes arose out of the oil and gas leases. Accordingly, the claim for taxes was a compulsory counterclaim. *See Grynberg, supra,* 809 P.2d at 1093 ("any claim regarding proper payment or monies due that defendants might have against plaintiff arises out of the same contract and is logically related to plaintiff's claims" and "is, therefore, a compulsory counterclaim").

Because Williams failed to include its claim for severance and ad valorem taxes in its pleadings, and did not otherwise put that claim at issue any time prior to or during the trial, the court erred in rendering a finding that the taxes were properly deductible. Accordingly, we reverse that portion of the judgment allowing for the deduction of those taxes.

The judgment is reversed as to the deduction of severance and ad valorem taxes and is affirmed in all other respects.

Judge TAUBMAN and Judge CASEBOLT concur.