2012 COA 175

**Anita RIVERA, Plaintiff–Appellant,**

v.

**AMERICAN FAMILY INSURANCE GROUP, Defendant–Appellee.**

No. 11CA2297.

Colorado Court of Appeals, Div. II.

Oct. 11, 2012.

McDivitt Law Firm, P.C., Durant D. Davidson, Colorado Springs, Colorado, for Plaintiff–Appellant.

Jones, Waters, Geislinger & Seymour, LLC, David L. Geislinger, Colorado Springs, Colorado, for Defendant–Appellee.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

Opinion by Judge STERNBERG.*

¶ 1 In this automobile insurance case, Anita Rivera, plaintiff, appeals the district court's order granting the C.R.C.P. 56(h) motion for a determination of law in favor of American Family Insurance Group (American Family), defendant. We affirm.

¶ 2 Rivera, while a passenger in an automobile, was seriously injured in a one-car accident when the driver lost control of the automobile. Rivera made a claim against the driver's insurer, American Family. The driver's policy, in its declarations page, provided that $100,000 was the policy limit for a bodily injury under the liability coverage section and that $100,000 was the limit for a bodily injury caused by an underinsured motorist. In the uninsured/underinsured (UM/UIM) coverage section, the policy provided, in relevant part:

> Underinsured motor vehicle means a land motor vehicle or trailer which is insured by a liability bond or policy at the time of the accident which provides bodily injury liability limits for which the amount paid is not enough to pay the full amount the insured person is legally entitled to recover as damages.

> Underinsured motor vehicle, however, does not mean a vehicle ... owned by or furnished or available for the regular use of you or a' resident of your household ... [or] insured under the liability coverage of this policy.

¶ 3 American Family paid Rivera $100,000, the policy limit of the liability section of the driver's policy but declined coverage under the UM/UIM section of the policy on her claim for damages that exceeded the policy limit of the liability section.

¶ 4 Rivera then sued American Family under C.R.C.P. 57(a), seeking a declaration that she was covered under the UM/UIM section of the driver's policy. In turn, American Family filed a motion under C.R.C.P. 56(h), seeking a determination of law upholding its

§ 24–51–1105, C.R.S.2012.

denial of Rivera's claim for coverage under the UM/UIM section.

¶ 5 In a well-reasoned order, the district court granted American Family's motion. It is clear from the face of this order that it resolved all issues before the district court; thus, we view the court's order as being final and appealable. Rivera appeals.

¶ 6 On appeal, Rivera does not dispute that the plain language of the policy is unambiguous. The policy provides that the driver's vehicle has $100,000 of bodily injury liability coverage but contains an insured vehicle exclusion that eliminates from the definition of "underinsured vehicle" a vehicle "insured under the liability coverage of this policy." This bars Rivera from recovering UM/UIM coverage benefits under the policy if, as here, she recovers the policy's liability coverage benefits. *See Cruz v. Farmers Ins. Exchange*, 12 P.3d 307, 309 (Colo.App.2000) ("Unless there is an ambiguity in the policy language, the policy must be enforced as written.").

¶ 7 Nevertheless, Rivera contends the policy language is unenforceable because the policy's insured vehicle exclusion violates section 10–4–609, C.R.S.2012, and, alternatively, even if the policy's insured vehicle exclusion does not violate that section, it contravenes the public policy of this state that tort victims injured by uninsured or underinsured motorists receive full compensation for their injuries. We disagree.

## I. Section 10–4–609

█ ¶ 8 The supreme court has applied an earlier version of section 10–4–609 to similar facts. *See Terranova v. State Farm Mut. Ins. Co.*, 800 P.2d 58 (Colo.1990). In *Terranova*, the insured was a passenger on a motorcycle which she owned and which was insured under her policy with the insurer. She was killed because of the negligence of a permissive driver (whom the policy defined as an additional insured). *Id.* at 59. The insurer paid liability policy limits, but, when the losses of the insured's estate exceeded those limits, the estate sought the difference between the UM/UIM coverage and the liability policy limits. *Id.*

¶ 9 The supreme court framed the issue as "whether the General Assembly intended section 10–4–609 to be a complete statement of uninsured motorist insurance requirements or whether policy provisions that limit recovery of uninsured motorist benefits may be valid under the circumstances." *Id.* at 61. The court held:

> Because of the distinct function of uninsured motorist insurance under Colorado's statutory motor vehicle insurance scheme, ... the exclusion of a vehicle insured under the liability terms of a policy from uninsured motor vehicle coverage does not violate the legislative purposes and the public policy underlying section 10–4–609. In our view, the General Assembly, by enacting section 10–4–609, did not intend to set forth comprehensive requirements for uninsured motorist coverage.

*Id.* at 62. In so holding, the court reasoned:

> The conclusion that the insured vehicle exclusion does not violate Colorado's public policy as set forth in section 10–4–609 is supported by a comparative review of the Colorado statutes relating to liability coverage and uninsured motorist coverage. The requirement of mandatory minimum liability coverage is to protect the public from financial loss caused by the ownership, operation or maintenance of an automobile by an insured. On the other hand, uninsured motorist coverage, which must be offered to an insured but may be refused in writing, is designed to protect an insured from losses caused by third parties. *The insured vehicle exclusion prevents a transformation of uninsured motor vehicle coverage into liability insurance when a claim is made for uninsured motorist benefits to compensate for injuries that result from the operation of a vehicle insured under the liability portion of a policy.* In essence, if the insured vehicle exclusion was found to be invalid, the insured would receive uninsured motorist coverage for a risk that was excluded by the policy, and which was not paid for by the insured and not contemplated by Colorado's uninsured motorist legislation.

*Id.* at 61–62 (emphasis added) (footnote and citations omitted).

¶ 10 *Terranova* is dispositive of this issue. The insured vehicle exclusion in the policy at issue in this case is virtually identical to the exclusion approved in *Terranova*. Accordingly, based on the analysis and holding in *Terranova*, which has not been overruled, we conclude this insured vehicle exclusion does not violate section 10–4–609.

¶ 11 Some years after the *Terranova* decision, effective January 1, 2008, the General Assembly modified section 10–4–609 by adding subsection (1)(c), which provides:

> The coverage described in paragraph (a) of this subsection (1) shall be in addition to any legal liability coverage and shall cover the difference, if any, between the amount of the limits of any legal liability coverage and the amount of the damages sustained, excluding exemplary damages, up to the maximum amount of the coverage obtained pursuant to this section. A single policy or endorsement for uninsured or underinsured motor vehicle coverage issued for a single premium covering multiple vehicles may be limited to applying once per accident. The amount of the coverage available pursuant to this section shall not be reduced by a setoff from any other coverage, including, but not limited to, legal liability insurance, medical payments coverage, health insurance, or other uninsured or underinsured motor vehicle insurance.

§ 10–4–609(1)(c), C.R.S.2012. In addition, the General Assembly deleted language from other sections of the statute that had permitted insurers to include policy language prohibiting "stacking" of UM/UIM coverage limits in policies issued to an insured and an insured's resident relatives. *See Snell v. Progressive Preferred Ins. Co.*, 260 P.3d 37, 38 (Colo.App.2010)(citing Ch. 212, sec. 4, § 10–4–609(2), 1992 Colo. Sess. Laws 1759; Ch. 92, sec. 1, § 10–4–609(4), 1983 Colo. Sess. Laws 454). Together, these legislative changes collectively have been called the "stacking amendments." *See id.* at 38 n. 1.

¶ 12 Rivera contends that, because section 10–4–609 has been amended, *Terranova* is no longer good law. We disagree.

¶ 13 The General Assembly is presumed to have knowledge of the judicial precedent in a particular area when it enacts legislation in that area. *Rauschenberger v. Radetsky*, 745 P.2d 640, 643 (Colo.1987). Hence, when a statute is amended, the judicial construction previously placed upon the statute is deemed approved by the General Assembly to the extent the statute remains unchanged. *Id.* Moreover, courts will not infer a legislative intent to change the meaning of a statute, in the course of a general revision, unless such intent is "clearly and indubitably manifested." *Davis v. Conour*, 178 Colo. 376, 382, 497 P.2d 1015, 1018 (1972).

¶ 14 We conclude *Terranova* has not been nullified by the stacking amendments to section 10–4–609, for three reasons.

¶ 15 First, even though other parts of section 10–4–609 were added, deleted, or modified, the statutory language that *Terranova* construed has not been changed. In our view, the language from subsection (4) was deleted merely to harmonize that subsection with the new subsection (1)(c), which indicates to us that the General Assembly was aware of, and approved of, the prior judicial construction. *See Rauschenberger*, 745 P.2d at 643.

¶ 16 Second, the "setoff" that the stacking amendments in subsection (1)(c) prohibit is different from the "exclusion" upheld in *Terranova*. A "setoff" is "a debtor's right to reduce the amount of a debt by any sum the creditor owes the debtor; the counterbalancing sum owed by the creditor." *Black's Law Dictionary* 1496 (9th ed.2009); *see, e.g., Savage v. Williams Prod. RMT Co.*, 140 P.3d 67, 72 (Colo.App.2005). Conversely, an "exclusion" is "an insurance-policy provision that excepts certain events or conditions from coverage." *Black's Law Dictionary* at 646; *see Dupre v. Allstate Ins. Co.*, 62 P.3d 1024, 1029 (Colo.App.2002). American Family does not seek to apply a "setoff" to the full amount of liability coverage that Rivera was owed under the policy because of the driver's negligence. To the contrary, American Family paid Rivera the policy's liability coverage limits. American Family has excluded UM/UIM coverage under the policy for the driv-

er's liability-coverage-insured vehicle—an insured vehicle exclusion like that upheld in *Terranova*. *See Terranova*, 800 P.2d at 59–60.

¶ 17 Third, the stacking amendments cannot be understood apart from the purpose of the UM/UIM coverage that section 10–4–609 states, which is "to compensate an innocent insured for loss, *subject to the insured's policy limits*, caused by financially irresponsible motorists." *Id.* at 61. In insurance law, "stacking" is the process of obtaining benefits from a second policy on the same claim when recovery from the first policy alone would be inadequate. *Bartholomew v. Wis. Patients Compensation Fund*, 293 Wis.2d 38, 717 N.W.2d 216, 239 (2006); *see Black's Law Dictionary* at 1534 (same); *see also* 2 Irvin E. Schermer & William J. Schermer, *Automobile Liability Insurance* § 29.1, at 29–2, 29–3 (4th ed.2004).

¶ 18 Given this purpose, the stacking amendments to section 10–4–609 make sense where an innocent insured seeks to stack coverage from *two separate* insurance policies—for example, the insured's own UM/UIM coverage and another driver's liability coverage—so that the insured's UM/UIM coverage, for which she paid, is not "reduced by a setoff from any other coverage, including, but not limited to, legal liability insurance." *See Vaccaro v. Am. Family Ins. Group*, 2012 COA 9, ¶ 60, 275 P.3d 750, 762 ("[UM/UIM] coverage creates a first-party relationship in which the insured may recover from his own insurer to the same extent he is legally entitled to collect from the driver of an underinsured vehicle, up to the policy limit."); *see also Snell*, 260 P.3d at 39 (in which the plaintiff "asserted that the $25,000 limit of her own UM/UIM coverage should be added to the [$50,000] limits of the other driver's policy, resulting in coverage of up to $75,000").

¶ 19 Within a *single* policy, however, an insurer and an insured may contract to restrict what types of injury the policy covers—and, thus, may except certain events or conditions from coverage in the first instance—without flouting the stacking amendments. *See, e.g., Mercury Indem. Co. v. Kim*, 358 Ill.App.3d 1, 294 Ill.Dec. 191, 830 N.E.2d 603, 609 (2005) ("Courts upholding these exclusions, or otherwise denying the availability of liability and underinsured motorist coverage *under the same policy*, have noted that the underlying purpose of underinsured motorist coverage is to protect the insured from the negligent driving of another, underinsured driver, not of the driver with whom he is riding." (emphasis added)). And, in the absence of an attempt to deny statutorily mandated coverage, an insured would be bound by the terms of such an insurance policy. *See Terranova*, 800 P.2d at 60 ("The policy, according to its clear and unambiguous terms, does not provide uninsured motor vehicle coverage for a vehicle insured for liability coverage.").

¶ 20 In our view, because a named insured would be bound by such a policy, it follows that an injured third-party plaintiff, like Rivera, who is not a named insured but who claims entitlement to UM/UIM coverage only because she was a passenger in a named insured's vehicle, also would be bound by such a policy. *See, e.g., Parekh v. Mittadar*, 97 So.3d 433, 440 (La.Ct.App.2012) ("Allowing a guest passenger to recover both liability and [UM/UIM] benefits from the same insured's policy converts the [UM/UIM] coverage into a second layer of liability insurance, which was not contemplated in the policy costs.").

## II. Public Policy

¶ 21 Finally, we consider whether, even if the policy's insured vehicle exclusion does not violate section 10–4–609, it contravenes the public policy of this state that tort victims injured by uninsured or underinsured motorists receive full compensation for their injuries. We conclude it does not.

¶ 22 The supreme court has reasoned that the legislative intent of section 10–4–609

is to "provide an insured with benefits to the extent necessary to recover for loss caused by a negligent and financially irresponsible motorist, *subject to policy limits*." The intent of the legislature is served when a person injured by an uninsured or underinsured motorist receives

insurance coverage to the same extent as a person injured by an insured motorist.

*Union Ins. Co. v. Houtz,* 883 P.2d 1057, 1064 (Colo.1994) (emphasis added) (citations omitted) (quoting *Kral v. Am. Hardware Mut. Ins. Co.,* 784 P.2d 759, 765 (Colo.1989)). Section 10–4–609, however, "does not require full indemnification of losses suffered by an insured; it provides coverage only to the extent necessary to compensate an insured for loss, *subject to the limits of the insurance contract." Williams v. State Farm Mut. Auto. Ins. Co.,* 195 P.3d 1158, 1161 (Colo.App.2008)(emphasis added). Because section 10–4–609 does not require full indemnification for loss, and because an insurance policy may lawfully except certain events or conditions from coverage in the first instance, the policy's insured vehicle exclusion does not violate public policy.

¶ 23 Similarly, in upholding the insured vehicle exclusion, the supreme court in *Terranova* observed that "[a] majority, and the better reasoned cases, have upheld the exclusion of a vehicle under the liability coverage of the policy from uninsured motorist benefits." *Terranova,* 800 P.2d at 61.

¶ 24 The order is affirmed.

Judge CASEBOLT and Judge GRAHAM concur.