The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
June 3, 2021

## 2021COA78

**No. 19CA2052, Briargate at Seventeenth Avenue Owners
Association v. Nelson — Real Property — Common Interest
Communities — Colorado Common Interest Ownership Act;
Creditors and Debtors — Accord and Satisfaction — Setoff**

A division of the court of appeals considers whether a

homeowner may offset what he owes in assessments to a

homeowners' association (HOA) against what the HOA owes him

from judgments entered in prior court cases. The division

concludes that any common law right in the homeowner to offset

damages is barred by the public policy of Colorado's Common

Interest Ownership Act (CCIOA), sections 38-33.3-101 to -402,

C.R.S. 2020.

The division also determines that (1) the homeowner's practice

of using restrictive endorsements on checks to the HOA, without

regard to whether a dispute existed, was indicative of a lack of good

faith undermining the homeowner's reliance on the defense of accord and satisfaction set forth in section 4-3-311, C.R.S. 2020, of the Colorado Uniform Commercial Code; (2) the HOA was entitled to reject checks with restrictive endorsements on them; (3) the homeowner's obligations with respect to the rejected checks were suspended from the time the checks were "taken" by the HOA until they were rejected by the HOA; and (4) the HOA, as the prevailing party, was entitled to reasonable attorney fees and costs. The division reverses a relatively minor part of the judgment and remands the matter for a recalculation of damages.

Court of Appeals No. 19CA2052
City and County of Denver District Court No. 18CV32628
Honorable Kandace C. Gerdes, Judge

Briargate at Seventeenth Avenue Owners Association, a Colorado non-profit corporation,

Plaintiff-Appellee,

v.

John G. Nelson,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
ORDER AFFIRMED, AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE DAILEY
Freyre and Yun, JJ., concur

Announced June 3, 2021

Winzenburg, Leff, Purvis & Payne, LLP, Wendy F. Weigler, Littleton, Colorado, for Plaintiff-Appellee

Law Office of John G. Nelson, John G. Nelson, Denver, Colorado, for Defendant-Appellant

¶ 1    In this action to collect unpaid homeowners' association (HOA) assessments, defendant, John G. Nelson, appeals the trial court's entry of judgment in favor of, and award of attorney fees and costs to, plaintiff, Briargate at Seventeenth Avenue Owners Association (Briargate). We affirm in part, reverse in part, and remand with directions.

## I.    Background

¶ 2    Briargate is the HOA for certain condominiums in Denver. Nelson has been one of the condominium owners since 2002.

¶ 3    The parties previously engaged in litigation, resulting in money judgments in favor of Nelson.

¶ 4    Briargate brought the present action in July 2018 to recover alleged unpaid assessments, interest, collection costs, and attorney fees.

¶ 5    Three years earlier, Briargate had adopted a resolution (February 2015 Resolution) providing that (1) balances left unpaid for ten days would accrue a monthly late fee of $50, an 8% per annum interest rate, and service fees; (2) it could collect attorney fees for legal actions to recover unpaid balances; and (3) owners' payments to Briargate would be allocated in the following order:

1

legal fees and costs, enforcement and collection expenses, late fees, returned check charges, lien fees, any costs and fees pursuant to the "Declaration [of the HOA]," and lastly regular or special assessments.

¶ 6    In January 2016, Nelson began paying Briargate his monthly HOA assessments with checks containing a handwritten notation in the memo line saying either "HOA Account — Payment in Full" or "HOA Account + Payment in Full."  He did this, he said, because Briargate (1) had used "concerning" accounting practices in the past and (2) changed management companies, making it no longer feasible for him to pay his bills in person and obtain paper receipts in return.

¶ 7    Nelson's account with Briargate had a zero balance as of June 30, 2016.  But earlier, in February 2016, Briargate had notified its members in a letter that (1) a special assessment for an insurance deductible on a new roof was necessary and (2) "[e]ach owner is responsible for their portion of the deductible according to your

ownership percentage.  Your percentage, and the amount due, is listed on the enclosed statement."[1]

¶ 8    When Nelson had not paid the special assessment by September 21, 2016, Briargate (1) notified him in a letter that his account was "delinquent" in the amount of $984.99; and (2) attached to the letter a page from a ledger showing Nelson owed $905, plus a late fee and interest, in connection with the "Insurance Deductible."  Thereafter, Briargate again notified Nelson via letter (this time through certified mail) of the delinquency and twice in the form of a debt collection notice pursuant to section 38-33.3-316.3, C.R.S. 2020.

¶ 9    Between June 2016 and March 2017, Nelson sent Briargate nine handwritten checks, all for his regular monthly assessments and each containing a restrictive endorsement of the type mentioned above.  (During this time, the only payments Nelson did not make to Briargate were for the $905 special assessment and

---

[1] According to Nelson, he never received the letter.  He admitted, however, hearing a rumor about the roof assessment in the spring or early summer of 2016.

3

late fees and interest attached to it.)  Briargate deposited all nine of these checks.

¶ 10    Nelson sent two more checks, just like the previous nine, in April and May 2017.  However, Briargate returned these checks to Nelson.  In a letter dated June 5, 2017, Briargate notified Nelson that it rejected, and consequently was returning, his April and May 2017 checks "due to the[ir] restrictive endorsement[s]."

¶ 11    Nelson responded on June 10, 2017, in a letter informing Briargate that, rather than continuing to pay his account by check, he would (1) "start setting off monthly payments against the various judgments [he] hold[s] against the HOA" and (2) resume making payments by check when the balance of those judgments had been satisfied.

¶ 12    Between June 2017 and July 2018, Briargate continued to assess late fees and interest on Nelson's account.  It also added a second special assessment (totaling $10,860) to Nelson's account.  Nelson attempted to pay that special assessment with two checks,

one in October 2018 and one in November 2018.[2]  Briargate

returned his checks because (1) the October 2018 check bore a

"Oct. HOA + Sp. Assessment" notation; and (2) the November 2018

check was accompanied by a letter that said, "This check is

intended to cover my Nov. HOA fees plus the final eighteen

installments on the special assessment."  Briargate rejected those

checks because Nelson had directed that they be applied in a

manner contrary to the allocation specified in the February 2015

Resolution.

¶ 13    Nelson did not attempt to make any other payments but

continued to "offset" amounts Briargate claimed were owed to it

against the amount of the judgments owed to him.

¶ 14    The parties went to trial in June 2019.  Nelson, a licensed

attorney, represented himself.  At the conclusion of the trial, the

parties submitted written closing arguments.  As pertinent here,

Nelson argued that (1) Briargate's acceptance of checks between

---

[2] The checks were for $937.34 and $8,607.44, respectively. Although, as noted above, Nelson's portion of the special assessment was $10,860, these attempted two payments (which were also inclusive of his regular monthly HOA assessments) totaled only $9,544.78.

June 2016 and March 2017, each with a restrictive endorsement, effected an accord and satisfaction of any prior debt; (2) Briargate's nonaction with respect to, and ultimate rejection of, two checks — each of which had similar restrictions attached to it — operated to suspend any ongoing obligation; and (3) in any and all events, he was entitled to offset amounts he owed Briargate against amounts Briargate owed him from prior judgments.

¶ 15    In a written "Findings of Fact, Conclusions of Law, and Order," the trial court rejected Nelson's arguments. After determining that Nelson had unjustifiably breached his contractual obligations under the Declaration, the court entered judgment for Briargate and against Nelson for $21,467.48, plus 8% per annum prejudgment interest. And, finding that Briargate was the prevailing party, the court ordered Nelson to pay Briargate $19,219.68 in attorney fees and costs.

¶ 16    Nelson now appeals the trial court's judgment and order.

## II.    *Accord and Satisfaction*

¶ 17    Nelson contends that the trial court erred by rejecting his defense of accord and satisfaction. We disagree.

¶ 18    Whether an accord and satisfaction exists presents a question of fact, *R.A. Reither Constr., Inc. v. Wheatland Rural Elec. Ass'n*, 680 P.2d 1342, 1344 (Colo. App. 1984), upon which a trial court's finding would ordinarily be subject to reversal only for clear error, *see Indian Mountain Corp. v. Indian Mountain Metro. Dist.*, 2016 COA 118M, ¶ 31.[3]  However, whether the court has applied the correct legal standard in making a finding of fact is a question of law that we review de novo.  *In Interest of C.T.G.*, 179 P.3d 213, 221 (Colo. App. 2007).

¶ 19    "An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty.  Performance of the accord discharges the original duty."  *R.A. Reither Constr.*, 680 P.2d at 1344.  To establish an accord and satisfaction,

> it is necessary that the money should be
> offered in full satisfaction of the demand, and
> be accompanied by such acts and declarations
> as amount to a condition that the money, if

---

[3] A trial court's finding of fact is "clearly erroneous" if (1) it lacks support in the record; or (2) though it has some support in the evidence, "we are nonetheless left, after a review of the entire evidence, with the firm and definite conviction that a mistake has been made."  *Indian Mountain Corp. v. Indian Mountain Metro. Dist.*, 2016 COA 118M, ¶ 31.

> accepted, is accepted in satisfaction; and it must be such that the party to whom it is offered is bound to understand therefrom that if he takes it, he takes it subject to such conditions.

*Id.* (quoting *Hudson v. Am. Founders Life Ins. Co.*, 151 Colo. 54, 63-64, 377 P.2d 391, 396 (1962)); *see Anderson v. Rosebrook*, 737 P.2d 417, 419-20 (Colo. 1987) (same).

¶ 20 Under section 4-3-311(a) and (b), C.R.S. 2020, of the Colorado Uniform Commercial Code (CUCC), subject to exceptions not applicable here, a claim is discharged so long as (1) the person against whom the claim is asserted in good faith tendered an instrument to the claimant in full satisfaction of the claim; (2) the amount of the claim was unliquidated or subject to a bona fide dispute; (3) the claimant obtained payment of the instrument; and (4) the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.

¶ 21 The burden is on the debtor to prove that an accord and satisfaction was reached. *See* § 4-3-311 cmt. 4 ("The person seeking the accord and satisfaction must prove that the

8

requirements of [the statute] are met."); *McMahon Food Corp. v. Burger Dairy Co.*, 103 F.3d 1307, 1313 (7th Cir. 1996) (same).

¶ 22    The trial court rejected Nelson's accord and satisfaction defense based on its conclusion that Nelson did not satisfy the first ("good faith") element of the defense.

¶ 23    For CUCC purposes, "'[g]ood faith' means honesty in fact and the observance of reasonable commercial standards of fair dealing." § 4-3-103(4), C.R.S. 2020.  Official comment 4 to section 4-3-311 states, in relevant part,

> [an] example of lack of good faith is found in the practice of some business debtors *in routinely printing full satisfaction language on their check stocks so that all or a large part of the debts of the debtor* are paid by checks bearing the full satisfaction language, whether or not there is any dispute with the creditor. Under such a practice the claimant cannot be sure whether a tender in full satisfaction is or is not being made.  Use of a check on which full satisfaction language was affixed routinely pursuant to such a business practice may prevent an accord and satisfaction on the ground that the check was not tendered in good faith . . . .

(Emphasis added.)

¶ 24    Relying on this comment, the trial court found that Nelson had not acted in good faith because (1) he had put "HOA Account —

Payment in Full" on "every check, regardless of the existence of a dispute over the outstanding balance of his HOA account"; and (2) one of these checks was dated August 26, 2016, prior to Nelson's knowledge of his delinquent balance as of September 2016:

> Mr. Nelson was still in the process of verifying the origin of the 2016 special assessment while sending payments by check to Briargate. . . . Nelson's routine of writing full satisfaction language on checks to Briargate[,] and Briargate's advising Mr. Nelson of the outstanding balance on his account, leads the Court to find that Mr. Nelson's restrictive endorsement checks were not a good faith effort to establish an accord and satisfaction.

¶ 25 Nelson asserts the trial court erred in concluding that he did not act in good faith. Specifically, Nelson points out that he did not "pre-print" the full satisfaction language on his checks in the same fashion as the "business debtors" in the example given in official comment 4. Consequently, Nelson insists, the trial court's reliance on official comment 4 was misplaced.

¶ 26 There is no published Colorado authority discussing or applying either the definition of "good faith" in section 4-3-103(a)(4) or the "good faith" element of section 4-3-311. "When a Colorado statute is patterned after a model code, as the Colorado statute is

10

on the UCC, we may draw upon available persuasive authority in reaching our decision." *Georg v. Metro Fixtures Contractors, Inc.*, 178 P.3d 1209, 1212 (Colo. 2008).

¶ 27　In *Lupia v. Medicredit, Inc.*, 445 F. Supp. 3d 1271 (D. Colo. 2020), the federal district court for the District of Colorado applied section 4-3-103(a)(4), section 4-3-311, and comment 4 to section 4-3-311.

¶ 28　In *Lupia*, a patient was charged approximately $21,893 for medical services at a hospital; her insurance company sent a check to the hospital for approximately $7,154 containing full satisfaction language printed on its back; and she received a copy of the payment from the insurance company along with an explanation of benefits stating "Member Responsibility: $0.00." 445 F. Supp. 3d at 1277-78. "Believing she owed nothing further, [the patient] refused to pay" a bill sent to her from the hospital for the remaining balance of the charge. *Id.*

¶ 29　Relying on comment 4 to section 4-3-311, the federal district court concluded that the patient "failed to establish that [her insurer's] partial payment constituted an accord and satisfaction":

Although it is not clear that the inclusion of accord and satisfaction language on its checks was [the insurer's] standard business practice, the language plainly appears to be pre-printed on the check, suggesting such may be the case. Therefore, it is some evidence of a lack of good faith. However, [the patient], whose burden of proof it is to show good faith, offers nothing to countermand this suggestion. She does not show, for instance, that [the insurer] included this endorsement only on checks where it had a bona fide dispute about the amount of payment, or indeed offer any evidence suggesting how [the insurer] concluded that the submitted charges were not fully compensable. That [the patient] at the time of her admission to [the hospital] signed an agreement wherein she "acknowledge[d] full financial responsibility for, and agree[d] to pay, all charges . . . not otherwise paid by my health insurance" also weighs against a finding of good faith, which [the patient] has not rebutted with any competent evidence.

*Lupia*, 445 F. Supp. 3d at 1285.

¶ 30     The court's analysis in *Lupia* is instructive. Unlike in *Lupia,* there is no suggestion that Nelson's handwritten "payment in full" language on the checks to Briargate reflected an across-the-board business practice on his part. But it does appear to have been his standard practice vis-a-vis Briargate — and, perhaps more importantly — without disputing any particular debt.

¶ 31 In its order, the trial court referenced Nelson sending a check with accord and satisfaction language on it to Briargate before he had any notice of the special assessment for the roof. The record goes further than that, however: Nelson himself testified that he'd been handwriting restrictive endorsements on his checks to Briargate for months before he wrote the check upon which the court relied.

¶ 32 Further, as in *Lupia*, Nelson presented no evidence that the special assessment for the insurance deductible for the roof — or any other special assessment, for that matter — was either illegitimate or excessive. Nelson's only challenge to the legitimacy of the roof assessment was that a dollar amount was not mentioned in the initial letter notifying him of it. Ultimately, in September 2016 when he found out the amount, he did not challenge it, other than to say he didn't owe it because he had in law reached an accord and satisfaction with Briargate.[4]

---

[4] To the extent that Nelson argues Briargate's underlying basis for the assessment was somehow unsatisfactory, Nelson does not assert that he voiced his objection to Briargate's decision to repair the roof. Nelson's argument is not properly before us, then.

¶ 33    In a similar fashion, Nelson's submission of "payment in full" checks every month in the same amount,[5] despite accruing late charges, interest, and fees on the unpaid special assessment for the roof, was indicative of a lack of good faith.

¶ 34    Under these circumstances, we cannot fault the trial court for concluding that Nelson had not carried his burden of establishing a proper accord and satisfaction. Consequently, he is not entitled to reversal on this ground.

### III.    Checks Tendered by, but Returned to, Nelson

¶ 35    Nelson contends the trial court erred by holding that Briargate was entitled to sue and recover damages for payments it received, but refused to accept, in October and November 2018. More specifically, he asserts that (1) Briargate wrongfully rejected these payments and (2) at the very least his obligations to Briargate were suspended during the time his checks were "taken" by Briargate. We disagree with the first assertion but agree with the second.

---

[5] The amount encompassed only his base, monthly HOA dues.

### A. Briargate's Rejection of the Checks

¶ 36    Nelson had noted on one check, and in a letter accompanying the other check, that the payments encompassed by the checks were to be used for a regular and a special assessment. But, as Briargate noted, Nelson's directives were contrary to the manner in which late payments were to be allocated by Briargate under the February 2015 Resolution.

¶ 37    "If a debtor directs the application of a payment, the duty is thereby imposed on the creditor, regardless of whether he does or does not agree or consent to the debtor's request, to apply the money as directed, *or return it to the debtor . . . .*" *Mumm v. Taylor*, 121 Colo. 157, 163, 213 P.2d 836, 840 (1950) (emphasis added).

¶ 38    Briargate was under no duty to accept the checks.

### B. Suspension of the Obligation

¶ 39    Under section 4-3-310(b), C.R.S. 2020, "[u]nless otherwise agreed . . . if a note or an uncertified check is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken . . . ." And, "[i]n the case of

15

an uncertified check, suspension of the obligation continues until dishonor of the check or until it is paid or certified." *Id.*

¶ 40 The two checks at issue here are the uncertified ones Nelson sent Briargate in October 2018 and November 2018 — for $937.34 and $8,607.44, respectively — and that Briargate returned to him, uncashed.

¶ 41 Nelson asserts that his delivery of the checks, and Briargate's retention of them before returning them, constituted a "taking" of the checks for purposes of section 4-3-310(b). Briargate, however, insists that since it did not cash the checks and returned them to Nelson, Briargate never "took" the checks under the statute.

¶ 42 In *Fifth Third Bank v. Jones*, 168 P.3d 1 (Colo. App. 2007), a debtor sent a certified check to pay a debt at the bank. A bank representative "noted receipt of the check in the bank records and forwarded it to the payoff department." *Id.* at 2. A week later, the parties learned that the check had been lost, and the bank decided that the debtor had not satisfied his obligation.

¶ 43 Section 4-3-310(a) provides that

> [u]nless otherwise agreed, if a certified check . . . is taken for an obligation, the obligation is discharged to the same extent

> discharge would result if an amount of money
> equal to the amount of the instrument were
> taken in payment of the obligation.

¶ 44 The division in *Fifth Third Bank* was tasked with considering whether the bank had "taken" the check while internal procedures at the bank were pending. Noting comment 2 to the statute, the division concluded that "the taking for an obligation occurs simultaneously with the giving of the payment." *Fifth Third Bank*, 168 P.3d at 2; *see* § 4-3-310(a) cmt. 2 (the check "is given in payment of an obligation"). Therefore, the bank had "taken" the check.

¶ 45 The division in *Fifth Third Bank* addressed the meaning of the word "taken" in the context of section 4-3-310(a) dealing with certified checks. Here, we consider the meaning of that term as used in 4-3-310(b) dealing with uncertified checks. No matter. The concept remains the same regardless of the type of check.

¶ 46 In *Scalise v. American Employers Insurance Co.*, 789 A.2d 1066, 1070 (Conn. App. Ct. 2002), the appellate court recognized that "the *delivery* of a note or an uncertified check suspends an obligation to pay" until dishonor of the note or check or until either is paid. (Emphasis added.) "A check is . . . often referred to as

conditional payment, the condition being its collectability from the bank on which it is drawn." *Id.* at 1071 (citation omitted). Because the date of payment would then "relate back" to the day the creditor "took" payment from the debtor, it is logical that, until the check is cashed, the debtor's obligation is suspended.

¶ 47     The trial court in *Scalise* provided a well-reasoned example of why the timing for a "taken" check is important:

> Suppose an individual pays a telephone bill by check on April 1 but the telephone company does not deposit the check until 30 days later. To hold that the obligation is discharged upon the check clearing would allow the telephone company to argue that the bill was paid late and charge the individual a late fee. The telephone company would benefit from its own delay by penalizing the individual for the late deposit. If the check did not clear, however, then the telephone company would have a cause of action against the individual.

*Scalise v. Am. Emps. Ins. Co.*, No. CV 970158687S, 2000 WL 765121, at *3 n.8 (Conn. Super. Ct. May 25, 2000) (unpublished opinion), *aff'd,* 789 A.2d 1066.

¶ 48     Here, it is undisputed that Briargate returned the checks to Nelson. The effect of the statute, then, "does no more than recognize the uncertainty attendant upon an uncertified and unpaid

18

check and suspends the obligation until that uncertainty is resolved." *France v. Ford Motor Credit Co.*, 913 S.W.2d 770, 772 (Ark. 1996). It follows that during the time Briargate had possession of (that is, had "taken") the checks before returning them to Nelson, the account was "uncertain," and thus had been suspended. The suspension ended when Briargate returned the checks.

¶ 49 The consequence of all this is not that Nelson's obligations were suspended until the outcome of the trial; they were suspended to the extent of the amounts on the checks, and only for the time it took for Briargate to return the checks. It appears to us that the court erroneously included in the judgment late fees, interest, and penalties for the apparently short times Nelson's obligations were suspended.[6] Consequently, the judgment will have to be recalculated. Because we are not capable of making the findings of

---

[6] Briargate purported to have returned the October 2, 2018, check by a letter dated October 15, 2018. Briargate purported to have returned the November 5, 2018, check by a letter dated December 11, 2018.

fact necessary to make these determinations, a remand to the trial court for this purpose is required.

### IV. *Equitable Offset*

¶ 50    We reject Nelson's contention that the trial court erred by not offsetting what he owed Briargate against what it owed him from prior judgments.

¶ 51    "A 'setoff' is 'a debtor's right to reduce the amount of a debt by any sum the creditor owes the debtor; the counterbalancing sum owed by the creditor.'" *Rivera v. Am. Fam. Ins. Grp.*, 2012 COA 175, ¶ 16 (quoting Black's Law Dictionary 1496 (9th ed. 2009)); *see In re Adamic*, 291 B.R. 175, 181 (Bankr. D. Colo. 2003) ("The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" (quoting *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995))).

¶ 52    The right of setoff is a common law right. *United States v. Munsey Tr. Co. of Wash., D.C.*, 332 U.S. 234, 239 (1947); *see In re Balducci Oil Co.*, 33 B.R. 847, 850-51 (Bankr. D. Colo. 1983) ("In Colorado, the doctrine of setoff has long been recognized."); *Marso v. Homeowners Realty, Inc.*, 2018 COA 15M, ¶¶ 23-46

20

(recognizing "common law setoff rules").  As such, the right can be prohibited, waived, or relinquished by statute, regulation, or agreement.  *See Kailey v. Chambers*, 261 P.3d 792, 798 (Colo. App. 2011) (noting that the General Assembly may change common law through legislation "manifest[ing] its intent expressly or by clear implication"); *James Constr. Grp., LLC v. Westlake Chem. Corp.*, 594 S.W.3d 722, 764 (Tex. App. 2019) ("Parties can waive common law rights by agreement, and we respect their freedom of contract to do so.") (footnote omitted); *cf. Ensley, Inc. v. United States*, 114 Fed. Cl. 704, 714 (2014) ("[T]he government's common law setoff rights can be defeated or constricted only by 'explicit contractual, statutory, or regulatory language.'" (quoting *J.G.B. Enters., Inc. v. United States*, 497 F.3d 1259, 1261 (Fed. Cir. 2007))).

¶ 53     Here, the trial court ruled that Nelson "was contractually barred from offsetting his obligation to pay assessments for any reason."[7]

---

[7] Nelson asserts that the trial court also decided that the doctrine of equitable offset is "limited to bankruptcy cases."  The court did not, though, decide that.  The court simply found inapplicable the bankruptcy cases upon which Nelson relied.

¶ 54    "HOA by-laws and Declaration[s] are contracts." *Keller v. Kay*,

96 N.Y.S.3d 605, 607-08 (App. Div. 2019); *see Swan Creek Vill.*

*Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 50, 134 P.3d 1122,

1132 ("[T]he Declaration constitutes a contract between the HOA

and its members and . . . a recorded Declaration imparts notice of

its contractual terms to all who acquire property subject to it."); *cf.*

*Park Place Ests. Homeowners Ass'n v. Naber*, 35 Cal. Rptr. 2d 51,

53-54 (Ct. App. 1994) (holding setoffs to HOAs are barred as against

public policy); *Trs. of Prince Condo. Tr. v. Prosser*, 592 N.E.2d 1301,

1302 (Mass. 1992) (barring setoff to the equivalent of an HOA as

contrary to public policy).

¶ 55    Here, article 11, section 11.1 of the Declaration governing the

HOA provides that "[a]ll assessments shall be payable in accordance

with the levy thereof and in accordance with the provisions of this

Declaration, and *no offsets or deductions thereof shall be permitted*

*for any reason . . . .*" (Emphasis added.)

¶ 56    This provision supports the trial court's ruling.  But Nelson

asserts that because the Declaration upon which the HOA relied

was recorded on November 2, 2017, it could not bar his right to

offset debts prior to that date.

¶ 57    Even assuming Nelson was correct in his assertion, it would do him no good.  That is because any common law right to offset damages is, in our view, barred by the public policy of the Colorado Common Interest Ownership Act (CCIOA), sections 38-33.3-101 to -402, C.R.S. 2020.

¶ 58    Pursuant to section 38-33.3-315(6), C.R.S. 2020, "[e]ach unit owner is liable for assessments made against such owner's unit during the period of ownership of such unit."  This is so because "it is in the best interests of the state and its citizens to establish a clear, comprehensive, and uniform framework for the creation and operation of" condominiums.  § 38-33.3-102(1)(a), C.R.S. 2020.  Thus, "the economic prosperity of Colorado is dependent upon" financially strengthening homeowners' associations in part "by increasing the association's powers to collect delinquent assessments, late charges, fines, and enforcement costs."  § 38-33.3-102(1)(b).

¶ 59    "Permitting a unit owner's duty to pay assessments to be nullified [by a claim of offset] would . . . threaten the financial stability of condominium associations throughout this state."

*Spanish Ct. Two Condo. Ass'n v. Carlson*, 2014 IL 115342, ¶ 31, 12

N.E.3d 1, 9.

> Whatever grievance a unit owner may have
> against the condominium trustees must not be
> permitted to affect the collection of lawfully
> assessed common area expense charges.  A
> system that would tolerate a unit owner's
> refusal to pay an assessment because the unit
> owner asserts a grievance, even a seemingly
> meritorious one, would threaten the financial
> integrity of the entire condominium
> operation.  For the same reason that taxpayers
> may not lawfully decline to pay lawfully
> assessed taxes because of some grievance or
> claim against the taxing governmental unit, a
> condominium unit owner may not decline to
> pay lawful assessments.

*Prosser,* 592 N.E.2d at 1302 ("[T]here is no right to a set-off against

a lawfully imposed condominium charge."); *see also, e.g., Naber*, 35

Cal. Rptr. 2d at 53 n.5 (same); *Mountain View Condo. Ass'n of*

*Vernon, Conn., Inc. v. Rumford Assocs., IV*, No. CV 9455693S, 1997

WL 120254, at *1-7 (Conn. Super. Ct. Mar. 4, 1997) (unpublished

opinion) (same); *Park Ctr. Condo. Council v. Epps*, No. 95C-05-033-

WTQ, 1997 WL 817875, at *2-4 (Del. Super. Ct. May 16, 1997)

(unpublished opinion) (same); *Pooser v. Lovett Square Townhomes*

*Owners' Ass'n,* 702 S.W.2d 226, 231 (Tex. App. 1985) (same).

¶ 60    We are persuaded by these authorities and, consequently, conclude that the trial court did not err by denying Nelson's defense of setoff.

*V.    Double Recovery*

¶ 61    Nelson next contends the trial court erred by admitting evidence of a December 2018 check for impeachment purposes only.  According to him, it should have also been admitted as substantive evidence that he had paid down his account.  We conclude that reversal is not warranted.

¶ 62    At trial, Nelson testified that he consistently dated and mailed his checks on the same day to prove certain checks were not late.  However, Briargate's counsel presented a $485.84 check written by Nelson dated December 6, 2018, which, according to the envelope, wasn't postmarked until sometime in late December 2018.[8]  The trial court admitted the check and the envelope into evidence over Nelson's objection for "impeachment purposes."

¶ 63    Briargate's ledger indicated that Briargate had deposited the December 2018 check on January 7, 2019, and applied it as a

---

[8] The exact date was illegible but the parties agreed it was "well after December 6, [2018]."

"legal payment." However, the trial court had excluded a portion of Briargate's ledger reflecting Nelson's account, stating it "will not consider any entries after December 1, 2018," for "either side." Consequently, the trial court calculated Briargate's damages between June 1, 2016, and December 1, 2018.

¶ 64    The effect of the court's orders, Nelson asserts, was to allow Briargate a double recovery on his $485.84 check: once when Briargate cashed his check, and a second time, as part of the judgment owed by Nelson to Briargate.

¶ 65    Significantly, at no time during trial did Nelson argue that the trial court's rulings gave Briargate a right of double recovery: not when the check was admitted for impeachment purposes only; not when the court announced it would not consider ledger entries after December 1, 2018, for calculating damages; and not in written arguments, either. The first time Nelson raised it was after trial, in his C.R.C.P. 59 motion for post-trial relief.

¶ 66    Objections to trial court rulings must be made contemporaneously with the court's actions before appellate review is afforded. *See Suydam v. LFI Fort Pierce, Inc.*, 2020 COA 144M, ¶ 80. Arguments made, as here, for the first time in a post-trial

motion are too late and, consequently, are deemed waived for purposes of appeal. *See Affiniti Colo., LLC v. Kissinger & Fellman, P.C.*, 2019 COA 147, ¶ 47 (collecting post-trial motion for reconsideration cases); *Fid. Nat'l Title Co. v. First Am. Title Ins. Co.*, 2013 COA 80, ¶ 51 (defense first raised in post-trial motion wasn't preserved for appeal); *see also People v. Schaufele*, 2014 CO 43, ¶ 49 (Boatright, J., concurring in the judgment) ("Motions for reconsideration are designed to correct erroneous court rulings; they are not designed to allow parties to present new legal arguments for the first time and then appeal their denial . . . .").

¶ 67 Consequently, reversal is not warranted on this ground.

## VI. Attorney Fees and Costs

¶ 68 Nelson appeals the trial court's award of costs and attorney fees. And both parties request awards of costs and attorney fees incurred on appeal. We conclude that Briargate alone is entitled to fees and costs.

¶ 69 Section 38-33.3-123(1)(c), C.R.S. 2020, provides: "In any civil action to enforce or defend the provisions of this article or of the declaration, bylaws, articles, or rules and regulations, the court

shall award reasonable attorney fees, costs, and costs of collection to the prevailing party."

¶ 70    We have concluded that, apart from a relatively minor issue regarding the amount of damages, the trial court properly entered judgment for Briargate.  Consequently, Briargate was entitled in the trial court to an award of attorney fees as the prevailing party.  Briargate is also entitled to attorney fees and costs for successfully defending its judgment on appeal.  Nelson is not entitled to his fees and costs on appeal.

## VII.    Disposition

¶ 71    The judgment is affirmed in part, reverse in part, the order is affirmed, and the matter is remanded to the trial court with directions to (1) determine the extent to which the judgment includes fees or interest assessed during the short time Briargate retained Nelson's October and December 2018 checks before returning them; (2) reduce Briargate's judgment in that amount; and (3) award Briargate its reasonable attorney fees and costs incurred on appeal.

JUDGE FREYRE and JUDGE YUN concur.

28